## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

JUSTIN BARKER,

     Plaintiff,

     v.

THE LOUISIANA SCHOOL FOR MATH, SCIENCE, AND THE ARTS,

     Defendant

Civil Action No.:

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

## <u>COMPLAINT</u>

**COMES NOW,** Dr. Justin Barker, by and through counsel, Plaintiff in the above captioned matter, and files her Complaint against Defendant The Louisiana School for Math, Science, and the Arts ("LSMSA"), for Defendant's violation of Plaintiff's rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et. seq.,* and violations of Plaintiff's rights to equal protection under the laws of the Fourteenth Amendment to the U.S. Constitution and federal rights under Title IX, pursuant to 42 U.S. § 1983. This employment discrimination case is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000(e) *et seq.* ("Title VII"). Plaintiff alleges that Defendants engaged in the practice of employment discrimination based on gender and sexual orientation, created an abusive and hostile workplace environment, and retaliated against Plaintiff by wrongfully terminating her as alleged in this Complaint. Plaintiff seeks declaratory, injunctive, and equitable monetary relief from these practices; compensatory and punitive damages; equitable remedies of accounting and restitution; and an award of costs, expenses, and attorney's fees.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff re-alleges and incorporates the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.     Plaintiff Justin Barker is a former resident of Natchitoches Parish, Louisiana and currently resides in Nashville, Tennessee, which is in Davidson County.

3.     Defendant LSMSA is a recipient of federal funds within the meaning of 20 U.S.C. § 1681, *et seq.* LSMSA geographically lies within Natchitoches Parish, Louisiana.

4.     All events and omissions giving rise to this Complaint occurred in Natchitoches, Louisiana, which is in Natchitoches Parish.

5.     Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is located within the Judicial District and the events and omissions giving rise to the Complaint occurred in this District.

6.     Plaintiff was an "employee" of Defendant LSMSA and an "aggrieved person" within the meaning of 42 U.S.C. §2000e(f) from on or about August 2017 until she was terminated on or about June 2020.

7.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, 28 U.S.C. §1367, and 42 U.S.C. §2000e(5)(f)(3).

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this litigation involves federal law, specifically claims made under Title IX, 20 U.S.C. § 1681 et. seq., and claims for deprivation of civil rights under the U.S Constitution, pursuant to 42 U.S.C. § 1983.

9.      This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff seeks redress and damages for deprivation of civil and federal rights under 42 U.S. § 1983.

10.     This Court has personal jurisdiction over Defendant pursuant to Federal Rules of Civil Procedure 4(k)(1) because Defendant is located and regularly conducts business in this jurisdiction and because the conduct giving rise to this cause of action occurred in this Judicial District.

11.     At all times material hereto, all Defendants were operating and licensed to do business in the State of Louisiana. Defendants are and have been covered "employers" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b) at all times relevant to this Complaint.

12.     Defendant(s) is a "person" within the meaning of 42 U.S.C. § 2000e(a).

13.     Service may be had upon LSMSA through Dr. Steve Horton, Executive Director of LSMSA, at 715 University Parkway, Natchitoches, LA 71457 and Sharon T. Gahagan, Chair of the LSMSA Board of Directors.

14.     Plaintiff Justin Barker brings this civil rights action based on repeated and pervasive incidents of harassment and retaliation by Defendant LSMSA and its employees.

15.     The harassment and retaliation from Defendant LSMSA was based on Plaintiff's gender and sexual orientation.

16.     Plaintiff repeatedly reported the harassment and discrimination to multiple persons in LSMSA leadership and Human Resources.

17.     The school officials, had little, if any, training or experience with respect to properly receiving, investigating, or responding to reports of employee harassment or retaliation.

18.     Dr. Barker was sexually harassed, discriminated against, and retaliated against over a period of two years.

19.     Plaintiff seeks recovery for the significant damages she has suffered as a result of Defendant's violation of Plaintiff's civil and constitutional rights.

20.     Plaintiff timely filed a charge within 180 days with the Equal Employment Opportunity Commission regarding the Defendant's discriminatory conduct.

21.     The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter, which was received on or about September 27, 2021.

22.     This complaint is being timely filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

## FACTUAL ALLEGATIONS

1.     Plaintiff re-alleges and incorporates the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.     Dr. Barker began her employment with Defendant in August 2017 as an Instructor of English.

3.     As a faculty member, Plaintiff worked within the Academic Services Division.

4.     Plaintiff's supervisor was Kristi Pope Key, Director of Academic Services.

5.     Key was responsible for evaluating Plaintiff, signing off on her time sheets, and determining whether she would receive a letter of intent (contract renewal) at the end of each school year.

LOVE-BOMBING AND HARASSMENT

6.      In early September 2017, October 2017, and again in December 2017, Key began

engaging Plaintiff outside of work via Facebook messenger to Plaintiff's personal Facebook

account.

7.      These messages and correspondence became more frequent via Facebook

messenger after December 2017.

8.      Key also began texting Plaintiff more frequently via iMessage on or about that

same time. Further, Key began inviting Plaintiff to spend the night at her house. The initial

offer was due to Plaintiff having issues with her own neighbor. However, even once that issue

was resolved, Key continued to invite Plaintiff for sleepovers.

9.      On February 5, 2018, Key began messaging Plaintiff via Google Chat and turned

off the history settings so that any and all messages would disappear after 24 hours.

10.     In February 2018, Plaintiff and Key met for coffee and talked about work stuff.

Key turned the conversation more personal and told Plaintiff about how, before she met her

husband, Key's brother and sister-in-law used to ask her if she was a lesbian.

11.     Between February 2018 and September 2018, Key specifically cooked and

prepared food for Plaintiff and would bring it to her at work.

12.     In March 2018, during a Google Chat conversation, Key told Plaintiff "I hope you

never leave. I want you to stay here for four forevers." During another conversation, Key also

said "I'm glad you're in this world."

13.     During another March 2018 incident, while at Key's house due to an invitation for

Plaintiff to join Key's family for the day before Easter, Key reached over and laid her hand on

Plaintiff's wrist and left her hand there to linger for an uncomfortably long amount of time.

14.     Throughout timeframe of this Complaint, Key would suggest that she and Plaintiff take trips together, give Plaintiff gifts (including a magnet with a uterus on it), send messages saying, "Thinking of you," invite Plaintiff to work in her office, discuss personal feelings with Plaintiff, engage in long uncomfortable hugs with Plaintiff, and squeeze-rub Plaintiff's upper arms anytime Key said goodbye after an encounter or if Plaintiff and Key saw one another in the hallway at Defendant's campus.

15.     On March 29, 2018 (over spring break), Key invited Plaintiff to join Key's family at Toledo Bend at a lake cabin.

16.     On the morning of April 5, 2018, Key saw Plaintiff walking across the NSU Library parking lot from Starbucks. Key pulled in and asked Plaintiff to get in her car to give her a ride. Once they arrived at Defendant LSMSA's parking lot, they sat in the car making small talk. When other faculty/staff started to arrive, Key commented "well, this will give them something to talk about."

17.     When discussing whether to see the movie *Black Panther*, Plaintiff suggested inviting another colleague and his partner, to which Key replied in all caps, "POTENTIAL DOUBLE DATE!"

18.     In July 2018, while returning from an off-campus lunch, Key began talking to Plaintiff about how Key's father was a philanderer who "got blow jobs from every woman in town."

19.     In April 2019, when Plaintiff's own therapist was unavailable, Plaintiff spoke with a Personal Counselor at LSMSA, Kim Cain, to understand Key's behavior. During this session, Cain asked, "Were you and Kristi in a relationship?" and when Plaintiff responded

"Um … not to my knowledge" and explained that Key was Plaintiff's supervisor and mentor, Cain asked more concisely "…were you and Kristi in an *actual* relationship?"

20.     In October 2019, after not speaking with Plaintiff for a period of time, Key saw Plaintiff at the water fountain and said, "hey boo."

21.     Plaintiff would often catch Key staring at her during events, activities, and meetings. A few other colleagues (particularly Karen Stirrett and Jennifer Mangum) noticed, as well, and asked Plaintiff about it.

DEVALUATION AND CREATION OF TOXIC WORK ENVIRONMENT

22.     In June 2018, Key stopped speaking to Plaintiff in any capacity. Key was Plaintiff's supervisor, and both were scheduled to co-teach two classes during STEM, a weeklong summer program which Key specifically asked Plaintiff to co-teach rather than another STEM professor or coordinator . There was no explanation for this sudden change in behavior until later when Key told Plaintiff that Key needed to "recalibrate" when it came to Plaintiff.

23.     On September 28, 2018, Dr. Barker had become increasingly more uncomfortable and worried about how Key's behaviors and interactions would affect her job, so Plaintiff sent a text message to Key asking about personal boundaries. Key's only reply was "I have decided to deliberately try not to dish with you about colleagues."

24.     On multiple occasions, Key was actively hostile toward Plaintiff, often in front of Plaintiff's colleagues and students. Additionally, by Fall 2019, Key became increasingly hostile to Plaintiff's close colleagues and friends, particularly Karen Stirrett, a new biology instructor. Stirrett resigned from the school after only that first year of teaching due to Key's behavior, stating in her resignation email that Key was the reason for her departure.

25.     On September 18, 2018, during a group conversation among colleagues at a reception for Governor Edwards, Key would not speak to Plaintiff or even look at her. However, later that night, Key began messaging Plaintiff on Instagram asking Plaintiff if she received the cat gift she had left in Plaintiff's mailbox.

26.     Also in September 2018, Key told Plaintiff that in May 2018, Key had to do an "emotional dump" and "recalibrate her feelings" regarding Plaintiff.

27.     In November 2019, at a conference in Seattle which was attended by Key, Plaintiff, and other members of LSMSA faculty, Key refused to stand with the LSMSA representatives during group events because Plaintiff was present.

28.     Often, Key displayed obsessive behavior when she would message Plaintiff on more than one medium until Plaintiff responded, or track Plaintiff down in her office under the false pretense that she had work-related information to share.

<u>REPORTING AND RETALIATION</u>

29.     Beginning in Spring 2018, Plaintiff sought the advice on multiple occasions of John Allen, Defendant LSMSA's Chief of Staff, regarding Key's increasing hostility and erratic behavior, especially in front of students and other colleagues.

30.     Additionally, there were several occasions where Key was openly hostile toward Plaintiff while she and Allen were together. Allen acknowledged that he noticed Key's behavior.

31.     In January 2019, Plaintiff exchanged messages with Allen asking why Key was treating Plaintiff so poorly.

32.     On January 29, 2019, Plaintiff met with Allen to discuss her concerns about Key. This discussion was in advance of a meeting Plaintiff had with Key the next day to discuss

course changes. Allen recommended that Plaintiff speak with Key after that meeting to discuss Key's treatment of Plaintiff. Allen even offered Plaintiff advice on things to say during that meeting.

33.     On January 30, 2019, Plaintiff met with Key to discuss course changes, as well as professional boundaries and Key's treatment of Plaintiff. Key told Plaintiff that she made Key uncomfortable and that lack of boundaries were Plaintiff's fault. Key refused to discuss any boundaries or resolutions for moving forward, despite Key remaining as Plaintiff's supervisor. Plaintiff began regular therapy treatment after this meeting due to Key's behavior.

34.     On February 11, 2019, Key and Allen were walking together down a hallway. Plaintiff was walking in the opposite direction. Allen attempted to say hello to Plaintiff, but he was interrupted by Key laughing and attempting to show him something on her phone. Plaintiff messaged Allen shortly afterward to point out the behavior. Allen acknowledged that he witnessed Key's hostile behavior toward Plaintiff and admitted that he attempted to facilitate an interaction between them. Plaintiff expressed concerns for job security, remaining at LSMSA, and that Key should not continue treating her in this way.

35.     On March 14, 2019, Plaintiff met with Allen to discuss an upcoming trip to San Antonio. During that meeting, Plaintiff and Allen further discussed Key's behavior toward Plaintiff.

36.     On March 20, 2019, Plaintiff notified John Allen that she had been offered another teaching position in San Antonio. She stated that she didn't want to leave LSMSA but felt like she needed to. Allen's response was that if Plaintiff was at the point of resignation, then maybe a conversation with Key was in order before Plaintiff made her final decision.

37.     On March 21, 2019, at the suggestion of Allen, Plaintiff met with Key to discuss the possibility of Plaintiff's resignation. At this meeting, Key admitted that she was never able, and probably would not be able to in the future, establish professional boundaries with Plaintiff. Later in the meeting, Key stated she was responsible for their relationship being "more than."

38.     On May 29, 2019, Plaintiff sent an email to Key asking for her input before making the final decision whether to accept a position in Durham, NC (Plaintiff ultimately turned down the position in San Antonio due to thinking Defendant LSMSA would help her professionally navigate the issues with Key). Attached to the email were Plaintiff's previous concerns and a desire to move forward with a professional relationship only, not a personal one or friendship. Key responded by accusing Plaintiff of wanting personal attention and a personal relationship (even though Plaintiff's initial email said the exact opposite).

39.     On June 5, 2019, Plaintiff received an email from Sheila Kidd, the Human Resources Coordinator, requesting a meeting the following day with her and Key to "address some communications concerns that have arisen."

40.     On June 6, 2019, Kidd changed the meeting location twenty minutes prior to the meeting. Key never attended the meeting. For two hours, Kidd questioned Plaintiff about the email to Key on May 29, 2019, accused Plaintiff of exhibiting harassing behavior, and dismissed Plaintiff's concerns about Key's treatment of her.

41.     Also, at this meeting, Plaintiff was presented with a document she was told contained "unofficial sanctions." Kidd told Plaintiff that both she and Key would have to sign this document. When Plaintiff offered that she was concerned how this document would affect her job, Kidd stated the document was merely a guideline and that nothing was set in stone.

42.     Key did not sign this document. Plaintiff was unaware of this fact until December 2019, a full six months later.

43.     On August 26, 2019, Plaintiff scheduled a meeting with Kidd to discuss the Fall 2019 semester and having Key as her supervisor again despite previous incidents.

44.     Plaintiff again met with Kidd on October 21, 2019, to discuss Key's behavior and how, despite Key still being Plaintiff's supervisor, it had been four months since they had spoken. At this meeting, Kidd acknowledged the lack of communication, supervisory support, and professional growth. Further, Kidd stated that Key's behavior stemmed from personal grievances, and she proposed no solutions to the issues other than for Plaintiff to give it time. During this meeting, Plaintiff requested a mediation, Kidd stated that mediation wasn't possible since nothing negative had happened. Kidd provided an example of a negative interaction that included "if Key had 'flipped off Plaintiff in a meeting' as being a negative interaction.

45.     Through all meetings between Allen and Plaintiff, Allen continued to tell Plaintiff that she needed to consider Key's feelings and what she was going through. When Plaintiff would ask how to move forward professionally, Allen repeatedly stated that Plaintiff needed to be patient and "everyone works through their 'feelings' at their own pace."

46.     Allen and Plaintiff met on October 24, 2019, to discuss Plaintiff's meeting with Kidd and Plaintiff's concerns about her professional growth. Plaintiff asked Allen about a mediation and why Kidd would refuse. Allen stated he did not know why Kidd would refuse it, but that he would follow up directly with her.

47.     Allen and Plaintiff met again on November 18, 2019, to discuss Key's behavior at the conference in Seattle. Allen admitted that Key's behavior made him uncomfortable. When

Plaintiff again asked about a mediation, Allen asked if Plaintiff would be willing to sit down

with him, Kidd, and Key. Plaintiff agreed, and Allen said he would determine if they were

interested.

48.     Plaintiff's Department Chair, Dr. Jocelyn Donlon, inquired to the administration

about a mediation for Plaintiff on November 20, 2019. Plaintiff's situation was untenable.

Donlon was told "the school's position is that the agreement y'all signed needs to stand

without further mediation or communication between you and [Key]." This is when Plaintiff

learns that Key was explicitly told by Defendant not to have contact with Plaintiff. Plaintiff

was unaware of this and had been given conflicting information by Kidd that everything was

going to work out and even encouraged Plaintiff to be friendly with Key when seeing her in

passing.

49.     Donlon attempted to facilitate a meeting between Key and Plaintiff regarding a

student plagiarism issue on November 21, 2019. This meeting was unsuccessful and lasted

only approximately five minutes. Key would not look at Plaintiff or speak to her, despite

needing to work together on a student issue.

50.     Plaintiff had another meeting with Allen on December 4, 2019. At this meeting,

Allen said Plaintiff needed to be patient and allow Key "time to process at her own pace."

Allen told Plaintiff that there was nothing that could be done to stop Key's hostile behavior

toward Plaintiff.

51.     On February 6, 2020, another faculty member, Jenny Schmitt, met with Allen and

Dr. Steve Horton, Executive Director, to express her concerns over how Plaintiff was being

treated and how the workplace was so toxic that Plaintiff was anxious, afraid, and

uncomfortable any time she was at work. Plaintiff was unaware of this meeting until after the fact.

52.     The next day, on February 7, 2020, Plaintiff went to Horton to discuss the situation with Key. She brought Schmitt with her as a witness and as a support colleague. During this meeting, Horton stated he was not aware of the situation (despite meeting with Schmitt the day prior) but wanted to remedy it. Next, Horton asked if Plaintiff would be interested in a mediation with a qualified, outside mediator. Plaintiff responded affirmatively. Horton said he'd follow up with Kidd and Key.

53.     In an email with Horton on February 14, 2020, Horton stated: "Justin: Dr. Key has no interest in any further mediation. She is satisfied with the agreement the two of you signed several months back. So a second mediation is out of the question. I'm going to visit with Sheila about this early next week." Plaintiff explained that there was never an initial mediation. Horton responded as follows: "For a mediation to happen, both parties have to agree to it initially. If one of the parties is not willing, that leaves the other party with the options of 1) doing nothing further or 2) filing a grievance using the school policy. Any employee who feels that feels harassed at any level has the right to file a grievance, which begins a formal process for resolution."

54.     Despite having no contact with Key for several months, Key ironically filed a grievance against Plaintiff just four days later, on February 18, 2020. This grievance alleges "workplace harassment and personal stalking," as well as not upholding confidentiality. Further, Key requests that Plaintiff's contract for the following school year not be reviewed and that Plaintiff should be terminated immediately if confidentiality is broken.

55.     The investigator for this grievance was Ruth Prudhomme. John Allen and Sheila Kidd recused themselves. This was Prudhomme's first time investigating a grievance of this type.

56.     As suggested by Horton, Plaintiff filed her grievance on February 20, 2020. Plaintiff's grievance alleged harassment and hostile work environment. Plaintiff submitted a binder with nearly 500 pages of evidence to support her claim.

57.     Prudhomme and Kidd discouraged Plaintiff from submitting a grievance.

58.     Despite Plaintiff's reports of harassment and Defendant's knowledge of Key's harassing and erratic behavior toward Plaintiff, Defendant did not remove Key as Plaintiff's supervisor until February 2020. Further, Plaintiff was never notified that Key had been removed as her supervisor. Plaintiff only knew due to seeing the change while she was certifying her time.

59.     After submitting her grievance, Plaintiff was told that her grievance could not be investigated until after the completion of Key's investigation. Plaintiff was told she would be contacted later that week. In fact, she wasn't contacted until a few weeks later.

60.     Prudhomme contacts Plaintiff on March 2, 2020 to request a list of witnesses. When Plaintiff replied the next day, she asked Prudhomme if Key had been notified of the grievance. Plaintiff was fearful of running into Key at the school and told Prudhomme that she did not "feel comfortable going into the [high school building] and working in my office at this time."

61.     Later in the afternoon of March 3, 2020, Horton, clearly having heard from Prudhomme that Plaintiff was afraid to return to her office, emails Plaintiff and requires her to resume working in her office despite her fear. His email states, "Justin: Tomorrow, please plan

to resume normal hours in your assigned office in HSB 1020. I do not want either grievance or their investigations to affect the normal day-to-day operations, or workspaces for that matter, for the students, faculty, or staff. Thanks, Steve."

62.    Concurrently, that day, Schmitt is interviewed in relation to the grievances that were filed. Schmitt learns that the grievances were combined. Plaintiff has no knowledge of this, nor has she consented to it.

63.    Prudhomme interviews Plaintiff on March 11, 2020. Kidd, who had previously recused herself, was present to take notes.

64.    The next day, March 12, 2020, LSMSA announced they'd be dismissing students to return home due to COVID. Plaintiff emailed Prudhomme to ask if the investigation would continue or be placed on hold. Prudhomme stated the investigation would continue.

65.    Eleven days afterward, on March 23, 2020, Horton emails Plaintiff and states that Plaintiff would not receive a letter of intent (teaching contract extension) until he had the grievance report findings.

66.    Plaintiff replies to Horton's email on March 25, 2020, and points at that it had been six weeks since the grievances were filed, which was well beyond the seven-day timeline outlined in their Grievance Policy and Procedure Document. Horton replies two days later that a response will be provided no later than March 30, 2020.

67.    On March 29, 2020, Horton schedules an morning meeting with Plaintiff via Zoom for the next business day. At this meeting on March 30, 2020, Horton notified Plaintiff that Defendant dismissed Plaintiff's grievance due to lack of evidence, despite Plaintiff submitting nearly 500 pages of documentation.

68.     Horton further informs Plaintiff that the grievance that Defendant found in favor of the grievance Key filed against Plaintiff. Plaintiff was told she could choose her own separation date up until August 1, 2020. Her contract was set to expire May 31, 2020, but Defendant gave her the option of selecting a later date. Plaintiff was further told she would receive an excellent recommendation from the school whenever it's needed.

69.     On April 25, 2020, Horton notifies the school listserv that Plaintiff will not be returning. Horton also sent an email to students encouraging them to wish Plaintiff well in her new endeavors. Defendant had never sent a similar email for any other faculty or staff departure. Plaintiff did not consent to this, was not notified of this email (she learned from students), and was not emotionally prepared to answer questions from colleagues and students as to why she was leaving.

70.     In May 2020, Plaintiff notices that Key is still viewing Plaintiff's social media postings and watching her online behavior.

## CAUSES OF ACTION

**COUNT I: Lack of Policies and Procedures for Sexual Harassment, Discrimination, or Retaliation**

1.     Plaintiff re-allege and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.     As a recipient of federal financial funding, LSMSA is required to draft policies and procedures for sexual harassment and discrimination.

3.     The Title IX Coordinator is required to have knowledge of said policies and procedures and to ensure that LSMSA was in compliance with them at all times.

4.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not have any policies or procedures in place for sexual discrimination or did not follow the ones that were in place, such as:

5.      Plaintiff was not provided an Employee Advisor as outlined in Part V of Defendant's Grievance Policy and Procedure Document.

6.      Plaintiff was not allowed to address or rebut any of Key's allegations against her, as outlined in Part VIII, Provision I of the Defendant's Grievance Policy and Procedure Document.

7.      Plaintiff was not allowed to appeal the findings of the grievances, neither before nor after being informed of the school's decision to terminate her.

8.      Defendant failed to follow proper recusal procedure when they allowed Kidd to take notes on the grievance investigation after she recused herself.

9.      Defendant's Grievance Policy and Procedure document does not provide any policy, procedure, or guidance for employees who seek redress for harassment from their supervisors.

10.      Defendant failed to follow its outlined timelines or conduct investigations in a timely manner when investigating the sexual harassment claims.

11.      Defendant does not have adequate sexual harassment policies or training for faculty and staff. Instead, documents received by employees state "see student handbook" for the sexual harassment policies.

12.      Defendant's failure to establish policies and procedures for sexual harassment and discrimination effectively denied Justin Barker's clearly established federal rights and Constitutional rights.

13.     As a direct and proximate result of Defendant's actions, and inactions, Justin Barker suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, and mortification.

**COUNT II: Failure to Implement and Administer a Grievance Policy**

1.     Plaintiff re-allege and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.     As a recipient of federal financial funding, LSMSA is required to implement and administer a Grievance Policy to receive, investigate, and respond to reports of sexual harassment and discrimination against students.

3.     The Grievance Policy must be written in a language appropriate for the audience.

4.     The Title IX Coordinator must review the policy for compliance under Title IX.

5.     The Title IX Coordinator is responsible for coordinating the Grievance Policy and ensuring individual complaints are handled properly including informing all parties of the process and notifying all parties of the decision and the right to and procedure to appeal.

6.     Upon information and belief, at all times relevant hereto, Defendant LSMSA did not ensure that complaints were handled properly, including informing all parties of the process, notifying parties of decisions, or providing information on appeals or the appeals procedure.

7.     Defendant's failure to implement and administer a Grievance Policy effectively denied Justin Barker's clearly established federal rights and Constitutional rights.

8.     As a direct and proximate result of Defendant's actions, and inactions, Justin Barker suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, and mortification.

**COUNT III: Failure to Train Administrators, Faculty, and Staff on the Grievance Policy**

1.      The Title IX Coordinator should provide training to administrators, faculty, and staff on how Title IX protects against sexual harassment and discrimination, their rights and obligations under Title IX, and how to file a grievance.

2.      The Title IX Coordinator should provide consultation services regarding Title IX requirements to potential complainants.

3.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not train administrators and employees on the Grievance Policy or Title IX rights and obligations.

4.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not provide consultation services to potential complainants regarding Title IX requirements.

5.      Defendant's failure to train its administrators, faculty, and staff effectively denied Justin Barker's clearly established federal rights and Constitutional rights.

6.      As a direct and proximate result of Defendant's actions, and inactions, Justin Barker suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, and mortification.

**COUNT IV: Failure to Publish Notice of Nondiscrimination**

1.      Plaintiff re-allege and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.      As a recipient of federal financial funding, LSMSA is required to publish a notice that it does not discriminate on the basis of sex and that it is required by Title IX not to discriminate in such a matter.

3.      The notice must be widely distributed.

4.      The notice should be prominently posted on LSMSA's website, at various sites around the campus, and it should be in electronic and printed form for general distribution.

5.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not publish a Notice of Nondiscrimination.

6.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not distribute a Notice of Nondiscrimination.

7.      Upon information and belief, at all times relevant hereto, Defendant LSMSA did not post a Notice of Nondiscrimination on the website for LSMSA nor did they make electronic or printed copies available at the LSMSA office or campus.

8.      Defendant's failure to publish and distribute a Notice of Nondiscrimination effectively denied Justin Barker's clearly established federal rights and Constitutional rights.

9.      As a direct and proximate result of Defendant's actions, and inactions, Justin Barker suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, and mortification.

**COUNT V: Defendant Willfully, Wantonly, and Consciously Disregarded Plaintiff Reports**

1.      Plaintiff re-allege and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.      Justin Barker suffered employee-against-employee sexual harassment, which is considered sex discrimination prohibited by Title IX.

3.      Defendant had actual knowledge of the Plaintiff's sexual harassment and discrimination claims.

4.      Defendant had actual knowledge of the hostile environment Justin Barker continued to suffer in after reporting sexual harassment and discrimination.

5.      Defendant's administrators, employees, and agents with actual knowledge of Justin Barker's many reports had the authority and ability to investigate and take meaningful corrective action to remediate sexual harassment and the hostile educational environment Justin Barker suffered, but failed to do so.

6.      Defendant's actions, or inactions, created a climate in which sexual harassment, torment, and bullying against Justin Barker were tolerated.

7.      Defendant's failure to take meaningful disciplinary action, and Defendant's multiple failures to take any meaningful corrective action to remediate the sexual harassment and hostile environment that Plaintiff experienced after, and because of, reporting sexual harassment, denied Justin Barker's clearly established federal rights and Constitutional rights.

## COUNT VI — Negligence of Defendant LSMSA

1.      Defendant LSMSA owed Plaintiff a duty to comply with the statutory regulations of the Title VII and Title IX.

2.      Defendant LSMSA owed a duty to Plaintiff to exercise a reasonable degree of care to maintain a safe working environment for its employees.

3.      Defendant LSMSA had superior knowledge beginning in Spring 2018 of Key's inappropriate behaviors toward Plaintiff, yet they failed to take any actions to protect Plaintiff.

4.      Defendant LSMSA willfully and intentionally violated that duty when they failed to provide a safe working environment.

5.      Plaintiff was harmed by Defendant's actions and inactions.

6.      Plaintiff was in no way responsible for the unauthorized actions of Defendant LSMSA or its employees.

7.      Defendant LSMSA's misconduct was willful, wanton, and in conscious disregard of consequences such that the jury should award punitive damages.

8.      At all times described in this Complaint, Plaintiff was subjected to unwelcomed harassment from Key.

9.      At all times described in this Complaint, Defendant knew or should have known that said harassment was based on Plaintiff's gender or sexual orientation.

10.     At all times described in this Complaint, Defendant knew or should have known that said harassment was so pervasive as to create an abusive and unsafe working environment, both by an objective and subjective standard.

**COUNT VII — Defendant's Intentional Infliction of Mental and Emotional Distress**

1.      Plaintiff re-alleges and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein

2.      The conduct of the Defendants is outrageous in that it exceeded all bounds of decency which a reasonable person would deem intolerable in today's community standards.

3.      The conduct of the Defendants gave them the real or apparent power to affect Plaintiff's interests.

4.      Defendant knew or should have known that their conduct would likely result in harm to Plaintiff due to mental and emotional distress.

5.      Defendants acted with intentional and reckless disregard of the probability that Plaintiff would suffer from mental and emotion distress after being subjected to their conduct as described in this Complaint.

6.      Further, Defendant forced confidentiality on Plaintiff and retaliated against her when she sought emotional and professional support from close colleagues due to the ongoing harassment.

7.      Plaintiff suffered from substantial mental and emotional distress, including, but not limited to suffering, anguish, fright, nervousness, grief, anxiety, shock, humiliation, and shame.

**COUNT VIII: Defendant's Retaliation Against Plaintiff**

1.      Plaintiff re-alleges and incorporate the allegations contained in all prior paragraphs of this Complaint as if fully alleged herein.

2.      Defendant retaliated against Plaintiff after she filed her grievance and chose not to renew Plaintiff's teaching contract.

3.      Key's grievance against Plaintiff recommended that Plaintiff's contract not be renewed.

4.      Key was Plaintiff's immediate supervisor throughout the years of harassment she forced upon Plaintiff.

5.      Horton refused to issue a letter of intent to renew Plaintiff's teaching contract until the grievance investigations were complete.

6.      Plaintiff had a stellar employment record, respect of her colleagues and students, founded and ran a writing center for student, and volunteered at nearly all student or student life events. Failure to renew Plaintiff's teaching contract was retaliatory.

7.      As a direct and proximate result of Defendant's retaliation, Plaintiff suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, mortification, and lost wages.

## **DAMAGES**

As a direct and proximate result of Defendant's actions and inactions, Justin Barker suffered, and continues to suffer, injuries including, but not limited to emotional distress, psychological trauma, humiliation, mortification, lost wages, and benefits. Plaintiff has sustained actual and compensatory damages, and is entitled to recover costs, pre- and post-judgment interest, and attorneys' fees. Barker is also entitled to punitive damages under Title VII of the Civil Rights Act of 1964 based on Defendant's misconduct being willful, wanton, and in conscious disregard of consequences.

WHEREFORE, Plaintiff respectfully prays that Defendant be served with process and be required to answer this lawsuit, and that, after due proceedings:

1. There be judgment in favor of Plaintiff for her actual, punitive, liquidated and compensatory damages, attorneys' fees, pre- and post-judgment interest and costs; and

2. For special and general damages from the Defendant, for the personal injuries which Justin Barker has suffered in an amount to be determined according to the enlightened conscience of an impartial jury, including:

   a. All past, present, and future physical and psychological pain, suffering and impairment; and

   b. All medical bills, counseling, and other costs and expenses for past, present, and future medical and psychological care; and

   c. Attorneys' fees and all costs of litigation; and

   d. Interest at the legal rate on any judgment ultimately rendered;

3. Plaintiff be awarded any such other and further relief as this Honorable Court may deem just and appropriate; and

4.  Plaintiff be granted a trial by jury as to all claims herein.

Respectfully submitted, this 26th day of December, 2021.

/s/ Donald C. Hodge, Jr
LSB# 29251
4148 Palm Street
Baton Rouge, Louisiana 70808
(337) 794-8873 (v)
(888) 297-2959 (f)
attorneydonaldhodge@gmail.com

/s/ Joseph J. Steffen, Jr.
Joseph J. Steffen, Jr.
Georgia Bar No. 677766
Attorney for Plaintiff
317 Tattnall Street
Savannah, Georgia 31401
(912) 604-4147
steffjj@aol.com