UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JUSTIN BARKER

          *Plaintiff,*

v.

LOUISIANA SCHOOL FOR MATH
SCIENCES & THE ARTS.

          *Defendant.*

CASE NO. 1:21-cv-04419

JUDGE DRELL
MAGISTRATE JUDGE PEREZ-MONTES

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON BEHALF OF LOUISIANA SCHOOL FOR MATH, SCIENCES, AND THE ARTS**

## I.    INTRODUCTION

Plaintiff, Dr. Justin Barker ("Dr. Barker"), was hired in the fall of 2017 as an English teacher at Louisiana School for Math, Sciences, and the Arts ("LSMSA"), a residential public high school in Natchitoches, Louisiana. Dr. Barker began a friendship with Dr. Kristy Key ("Dr. Key"), who at all pertinent times served as the Director of Academic Affairs at LSMSA. Dr. Key became a friend and mentor for Dr. Barker.

At the end of Dr. Barker's first school year, Dr. Key began to set professional boundaries with Dr. Barker, stemming from a conversation with a faculty member who reported Dr. Barker claimed to have privileged access to the school's administration through her friendship with Dr. Key. The extent and nature of those boundaries were continuously at issue until Dr. Barker and Dr. Key agreed to formalize those boundaries in a June 2019 written agreement. The agreement

1

was facilitated by Human Resources at LSMSA. Thereafter, Dr. Key adhered to the boundaries of the agreement and did not speak or communicate privately with Dr. Barker. It was Dr. Key's adherence to the agreement which is the basis of Dr. Barker's claims herein. Based upon the evidence, including Dr. Barker's own testimony, she will be unable to establish she was subjected to sexual harassment by Dr. Key, or that LSMSA knew, or should have known, of the alleged harassment.

There is simply a complete absence of evidence that any of Dr. Key's actions, or inaction, towards Dr. Barker was harassment, or was "because of sex," an essential element to any claim of same-sex harassment under Title VII of the Civil Rights Act of 1964. Moreover, even if Dr. Key's actions, or inaction, could somehow rise to the level of harassment, LSMSA cannot be held vicariously liable in this matter since Dr. Barker failed to report the alleged harassment to the school. LSMSA had appropriate sexual harassment policies in place and Dr. Barker admitted she attended annual in-service training on those policies.

There is similarly no evidence that Dr. Barker engaged in a "protected activity" under Title VII of the Civil Rights Act of 1964 as she did not report the alleged harassment. As such, her claim of retaliation also fails. Even so, LSMSA had a legitimate, non-discriminatory reason to not renew Dr. Barker's contract since the school's investigation found it was Dr. Barker who violated the terms of the written agreement, that her actions were insubordinate, and obsessive.

Finally, Dr. Barker's various state law claims fail as a matter of law since there is no evidence of harassment, nor is there any evidence of malice or reckless disregard on the part of LSMSA. As there is no genuine issue as to Dr. Barker's inability to establish her burden of proof in this matter, the claims should be dismissed.

## II.    STATEMENT OF FACTS

In the fall of 2017, Dr. Barker was hired as an instructor of English at LSMSA.[1] During her first academic school year, Dr. Barker developed a friendship and mentorship with Dr. Key.[2] The two women communicated with each other through phone calls, text messages, emails, and social media.[3] They would occasionally see each other outside of school. They had coffee together, went to a movie with friends, and socialized at different events. The nature of their relationship never extended beyond that of platonic friends.

Dr. Barker is a female who identifies as queer.[4] Dr. Key is a female who is heterosexual and married to Dr. Randy Key, a mathematician who also teaches at LSMSA.[5]  Significantly, Dr. Barker never told Dr. Key that she was queer.[6] Dr. Barker and Dr. Key never engaged in any kind of physical or romantic relationship.[7] Dr. Barker was never asked by Dr. Key to engage in a physical or romantic relationship.[8] Dr. Key never told Dr. Barker that her job at LSMSA depended on her willingness to engage in a physical or sexual relationship with her.[9] Indeed, Dr. Key never told Dr. Barker that her job depended on a willingness to maintain their friendship.[10]

In May 2018, Dr. Key was approached by Dr. Kelly Lankeford, who served as the Department Chair for Humanities at the school.[11] Dr. Lankeford was concerned as to how Dr. Barker was representing her friendship with Dr. Key to other faculty, in particular that Dr. Barker

---

[1] Exhibit A, p. 9.
[2] Exhibit A, p. 21.
[3] Exhibit B, p. 65
[4] Exhibit A – Deposition of Dr. Barker, p.10.
[5] Exhibit B, p. 58; Exhibit C – Affidavit of Dr. Key.
[6] Exhibit A, p. 13; 17.
[7] Exhibit A, p. 20.
[8] Exhibit A, p. 20.
[9] Exhibit A, p. 20-21.
[10] Exhibit A, p. 23.
[11] Exhibit B, p. 52; 74. (At that time, Dr. Lankeford served as the Department Chair for Dr. Barker.)

claimed she had privileged access to the school's administration through Dr. Key.[12] Thereafter, Dr. Key began to set personal and professional boundaries with Dr. Barker. The two agreed not to talk or "dish" about their work colleagues.[13]

On March 21, 2019, Dr. Key and Dr. Barker met again to discuss further boundaries, but they were unable to agree to additional terms.[14] In May 2019, Dr. Key reached out to Sheila Kidd, the Human Resource Officer at LSMSA, to help facilitate an agreement between her and Dr. Barker. Dr. Barker was amenable to speaking with Ms. Kidd as she wanted to set boundaries, while also fostering a "good professional relationship" with Dr. Key which would allow her to continue to learn from Dr. Key as a mentor.[15]

On June 6, 2019, Dr. Barker met with Ms. Kidd. At the meeting, Dr. Barker signed a Professional Expectations Letter which outlined boundaries for all future communications between her and Dr. Key.[16] The agreement provided, in part, the following limitations:

> No contact via letters, notes, social media, gchats, or text. All outreach and correspondence should take place via LSMSA email and should be only professional in nature.

> No private meeting requests will be entertained. Face to face meetings on professional matters will include either Sheila Kidd or another third party designee (likely Dr. Jocelyn Donolon as current Chair).[17]

Thereafter, Dr. Key did not initiate any private interactions with Dr. Barker. There were a few instances where Dr. Key and Dr. Barker met for school-related issues, but always with a third-party present.

In the three years Dr. Barker worked at LSMSA, she succeeded professionally. Dr. Barker

---

[12] Id.
[13] Exhibit A, p. 28-29.
[14] Exhibit A, p. 49; 56.
[15] Exhibit A, p. 61; 62-63.
[16] Exhibit A, p. 71.
[17] Id at Exhibit 3. (Dr. Donolon took over as Department Chair at the beginning of the 2018-2019 school year.)

received a raise annually.[18] Dr. Barker was promoted from Instructor to Associate Lecturer.[19] She received good performance reviews from her department.[20] She was awarded a stipend for the work she did for the school's Writing Center.[21] Dr. Barker's professional development was approved and she was given several opportunities to represent LSMSA and present her research at national academic conferences.[22] Dr. Barker's expenses for the conferences were paid for by LSMSA and through grants she was awarded by the LSMSA's foundation.[23]

On February 16, 2020, Dr. Key filed a formal grievance with Human Resources stemming from continued communication by Dr. Barker in breach of the June 2019 agreement. On February 19, 2020, Dr. Barker filed her own grievance, alleging Dr. Key created a hostile work environment insofar as Dr. Key would not "acknowledge her on a professional basis."[24] Dr. Barker claimed Dr. Key would not talk to her, ignored her, and would not stand next to her at work events.[25] Dr. Barker alleged the "lack of engagement" by Dr. Key made her feel "afraid of losing a friend and mentor," and requested they find a way forward as professionals.[26] In her grievance, Dr. Barker did not claim she was sexually harassed by Dr. Key or by *any* employee at LSMSA.[27] Dr. Barker never told school administrators that she had been subjected to unwanted sexual advances or sexual contact.[28] Indeed, in the subsequent investigation conducted by LSMSA, Dr. Barker never reported her suspicion that Dr. Key's actions, or inactions, stemmed from unrequited romantic feelings towards Dr. Barker. Dr. Barker later testified that she did not want to inadvertently "out" Dr. Key

---

[18] Id at 116.
[19] Id.
[20] Id at 54.
[21] Id at 116.
[22] Id at 117-118.
[23] Id at 118-119.
[24] Exhibit D – LSMSA Grievance filed by Dr. Barker.
[25] Id; Exhibit A, p. 92.
[26] Exhibit D.
[27] Id.
[28] Exhibit A, p.93.

as being part of the LGBTQ community.[29]

Ultimately, the investigator at LSMSA found that Dr. Key's grievance held merit and that Dr. Barker's grievance did not. The investigator recommended Dr. Barker's contract not be renewed for the 2020-2021 school year. Dr. Steven Horton, LSMSA's Executive Director, reviewed both grievances, the supporting evidence, and decided not to extend a contract renewal to Dr. Barker for the upcoming school year.[30]

## III.    SUMMARY JUDGMENT STANDARD

In *Celotex Corp. v. U.S.*, 477 U.S. 317, 106 S. Ct. 2548, (1986), the Supreme Court recognized the burden of producing evidence at the hearing for Motion for Summary Judgment is first placed on the mover. The mover can meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case.[31] At that point, the party who bears the burden of persuasion at trial must come forth with the evidence which demonstrates he or she will be able to meet the burden at trial.[32] Rule 56 of the Federal Rules of Civil Procedure sets forth the applicable standard for granting a movants Motion for Summary Judgment. In pertinent part, Rule 56 provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. Rule Civ. Proc. 56(a). Thereafter, plaintiff must come forward with evidence that a genuine issue of material fact remains in dispute and demonstrate they would be able to meet their burden

---

[29] Exhibit A, p. 94.
[30] Exhibit E – Deposition of Dr. Horton, p. 92.
[31] *Celotex, supra.*
[32] Id.

of persuasion at trial.

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."[33] As stressed throughout, there is a complete lack of factual evidence to support plaintiff's numerous allegations. Therefore, summary judgment is appropriate.

## IV.    LAW AND ARGUMENT

### a.    Sexual Harassment/ Sexual Discrimination

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, religion, or national origin.[34] However, Title VII is not a "general civility code" and, thus, not all claims of sexual harassment rise to the level necessary to invoke Title VII's protections.[35]

Sexual harassment is a form of prohibited sex discrimination under Title VII and encompasses quid pro quo harassment and harassment that creates a hostile work environment.[36] An employee asserting a quid pro quo harassment claim must prove that they suffered a "tangible employment action" resulting from the "acceptance or rejection of [a] supervisor's alleged sexual harassment."[37] In such cases, the employee must present evidence that establishes a causal "nexus" between the harassment and the tangible employment action.[38]

---

[33] Fed. Rule Civ. Proc. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).
[34] 42 U.S.C. § 2000e-2(a)(1).
[35] *Thornhill v. Finley, Inc.,* No. CIV.A. 07-1033, 2008 WL 4344887, at *3 (W.D. La. Sept. 23, 2008).
[36] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404 (1986); *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 675-76 (5th Cir. 2021).
[37] *Id;* See also, *Rodrigue v. PTS Mgmt. Grp., LLC,* 550 F. Supp. 3d 376, 393 (W.D. La. 2021).
[38] *Caffery v. Letum Inc.,* No. 1:19-CV-00123, 2020 WL 12811204, at *3 (W.D. La. Dec. 29, 2020).

Plaintiff's employer becomes vicariously liable for the harassment only when plaintiff can show that the tangible employment action was taken as a result of plaintiff's acceptance or rejection of the unwelcome sexual harassment.[39] When no tangible employment action is demonstrated, the claim is classified as a hostile work environment claim.[40] To establish a prima facie case of a hostile work environment, the alleged harassment must be sufficiently severe or pervasive to alter the terms and conditions of employment.[41]  The alleged harassment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[42]

Where, as here, a plaintiff alleges a claim based on same-sex harassment, courts must first employ a two-step analysis based on the Supreme Court's decision in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In *Oncale*, the Supreme Court extended the protection of Title VII to same-sex harassment.[43]  The inference that verbal or physical harassment is *because of sex* is "easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex."[44]  Accordingly, to establish same-sex harassment under Title VII, a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discriminat[ion]* ... because of ... sex.'"[45]  If the first prong of *Oncale* is satisfied, courts will then move to the second prong which focuses on the traditional requirements for a sexual harassment claim under Title VII: "(1) that the

---

[39] *Casiano v. AT&T Corp*., 213 F.3d 278 (5th Cir. 2000).
[40] *Id*.
[41] *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993).
[42] *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).
[43] *Id.* at 79, 118 S.Ct. 998.
[44] *Id.* at 80, 118 S.Ct. 998.
[45] *Id.* at 81, 118 S.Ct. 998 (emphasis in original).

employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on a protected characteristic; and (4) that the harassment affected a 'term, condition, or privilege' of employment."[46] As plaintiff has failed to establish any credible evidence to show the alleged harassment by Dr. Key was because of sex, her claim fails as a matter of law.

### i. There is no evidence that the complained of conduct was "because of sex."

As recognized by the Supreme Court in *Oncale*, same-sex harassment is only actionable if it amounts to discrimination "because of sex." Dr. Barker cannot meet this threshold burden. Based upon *Oncale*, the Fifth Circuit has identified at least three ways that same-sex harassment can amount to discrimination on the basis of sex: (1) that the harasser allegedly made "explicit or implicit proposals of sexual activity" and there is "credible evidence that the harasser was homosexual;" (2) the plaintiff can show that the harasser was "motivated by general hostility to the presence of [members of the same sex] in the workplace;" or (3) the plaintiff may "offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."[47]

In this case, Dr. Barker concedes Dr. Key made no explicit proposals of sex to her.[48] Rather, Dr. Barker points to brief, non-specific encounters in support of her allegation there was an implicit sexual interest from Dr. Key. Dr. Barker notes Dr. Key gave her a long hug, touched her wrist while admiring a bracelet, squeezed her arm when saying goodbye, and on one occasion fixed the collar of her shirt.[49] Dr. Barker details an event in February 2018 in which Dr. Barker

---

[46] *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013) (citing *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162–63 (5th Cir. 2007)).
[47] *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002) (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998).
[48] Exhibit A, p. 20.
[49] Id at Exhibit 2, p. 1-3.

and Dr. Key attended a movie with two others and Dr. Key described the event by text as a "POTENTIAL DOUBLE DATE!" Dr. Barker admits that she did not feel the movie was a romantic date.[50] Similarly, Dr. Key testified she did not consider the movie to be a romantic date, but rather an event with friends.[51] The brief and isolated nature of these "physical" encounters undermines any argument that Dr. Key's actions were somehow implicit attempts to solicit sex from Dr. Barker.

Dr. Barker also points to numerous communications from Dr. Key to her via email, text message, gchat, and Facebook messenger in an effort to substantiate her claim of an implied sexual interest by Dr. Key. However, the sheer volume of communications between Dr. Barker and Dr. Key only serves to highlight the platonic nature of the relationship between the two women. Nowhere in any of the communications does either party discuss sex, sexuality, or a sexual relationship. Nowhere does Dr. Key explicitly, or implicitly, attempt to engage Dr. Barker in a sexual liaison. Even more detrimental to plaintiff's claim, there is a complete lack of credible evidence that Dr. Key is a homosexual, as required under *Oncale*.[52] Dr. Key is heterosexual and is married to a man.[53] Therefore, Dr. Barker cannot establish a case of same-sex harassment on the basis of implicit proposals of sex.

There is also a complete lack of evidence that Dr. Key made sexual advances towards other female faculty members at LSMSA or was in anyway "motivated by general hostility to the presence of [women] in the workplace." In fact, testimony shows that Dr. Key socializes, and maintains platonic friendships, with other female teachers at LSMSA.[54] There is no evidence that

---

[50] Exhibit A, p. 149.
[51] Exhibit B, p. 73.
[52] *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.
[53] Exhibit B, p. 58; Exhibit C.
[54] Exhibit B, p. 68

Dr. Key treated female faculty differently than male faculty. Other than the grievance filed by Dr. Barker, no other grievance, formal or informal, general or Title IX, has ever been filed against Dr. Key.[55] As such, plaintiff cannot establish same-sex discrimination using "comparative evidence" and her claim fails as a matter of law.[56]

> ii. **Plaintiff cannot establish a quid pro quo claim of sexual harassment and cannot demonstrate a nexus between the tangible employment action and the alleged harassment.**

Even if Barker could satisfy the threshold question in *Oncale*, which she cannot, there is a complete lack of evidence to substantiate the second prong of the analysis, the "traditional" elements of a sexual harassment claim. Dr. Barker does not identify which type of sexual harassment she is alleged to have suffered, but it is clear her claim fails on both fronts. In a claim of quid pro quo sexual harassment, a plaintiff must establish a nexus between a "tangible employment action" resulting from the "acceptance or rejection of [a] supervisor's alleged sexual harassment.[57]

First, Dr. Barker admits there was no quid pro quo arrangement, nor was there even a suggestion of such an arrangement. Specifically, Dr. Barker testified as follows:

Q:     … Did you or Dr. Key ever engage in a physical, sexual – any kind of physical, sexual conduct?

A:     No.

Q:     Okay. Did Dr. Key ever ask you to engage in physical sexual conduct?

A:     No.

Q:     Did Dr. Key ever tell you that your job depended on your willingness to engage in a physical, sexual relationship or physical, sexual conduct with

---

[55] Exhibit E, p. 144.
[56] *La Day, supra.*
[57] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404 (1986); *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 675-76 (5th Cir. 2021).

her?

A:    No.

Q:    Okay. Did Dr. Key ever ask you to be in a romantic relationship with her?

A:    No.

Q:    And I say romantic relationship meaning – or an emotional relationship even without physical acts?

A:    No.

Q:    Okay. Did Dr. Key ever tell you that your job depended on your willingness to enter into a romantic relationship with or without physical acts?

A:    No.[58]

…

Q:    Okay. Thank you. Did Dr. Key ever tell you that your job depended on your willingness to be friends with her?

A:    No.[59]

Secondly, the alleged harassing behavior ended in May 2018 when Dr. Key began to set professional boundaries in their friendship. Dr. Barker said that by May or June 2018, Dr. Key stopped speaking to her in any capacity.[60] This arraignment was later formalized in the HR agreement in June 2019, which effectively ended all private communications between Drs. Key and Barker. The decision not to renew Dr. Barker's contract occurred in May 2020, almost two years after Dr. Key stopped speaking to Dr. Barker. Given the significant temporal gap, Dr. Barker cannot establish a nexus between the allegedly harassing communications from Dr. Key, and the decision to not renew her teaching contract in May 2020. As such, a claim for quid pro quo sexual

---

[58] Exhibit A, p. 20-21.
[59] Id at 23.
[60] Id at Exhibit 2, p. 3.

harassment fails.

### iii. Plaintiff cannot establish a hostile work environment as the alleged harassment was not objectively offensive nor did it affect a Term, Condition, or Privilege of Employment.

Similarly, plaintiff cannot show sufficient evidence of a hostile work environment. Sexual harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[61] Isolated incidents of harassment generally will not support a hostile work environment claim unless they are extremely serious. [62] The conduct complained of must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so.[63] The offensive conduct must go beyond "[t]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."[64] Whether the alleged conduct creates a hostile or abusive work environment "requires a careful consideration of the social context in which particular behavior occurs and is experienced by its target."[65] This enables "courts and juries to distinguish between simple teasing or roughhousing among members of the same sex" and conduct that is severely hostile or abusive.[66] This inquiry must also consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether

---

[61] *Boh Bros.*, 731 F.3d at 453 (citing *Aryain v. Wal–Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008)).

[62] *Ivey v. Brennan*, 770 F. App'x 661, 665 (5th Cir. 2019) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see also Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435 (5th Cir. 2005) (citing *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)).

[63] *Harvill*, 433 F.3d at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).

[64] *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275.

[65] *Oncale*, 523 U.S. at 81, 118 S.Ct. 998.

[66] *Id*.

it unreasonably interferes with an employee's work performance."[67] Even if the allegedly harassing conduct is not frequent or pervasive, isolated episodes of harassment can support a hostile environment claim if they are extremely serious. This requirement reflects the touchstone for any hostile environment claim, that the conduct be sufficient to "alter the condition of the victim's employment and create an abusive working environment."[68]

While Dr. Barker claims she was subject to a hostile work environment by Dr. Key's conduct, even if true, the complained of conduct is not the type of physically threatening, hostile, or otherwise sexually charged behavior that would be "objectively offensive" or that would unreasonably interfere with an employee's opportunity to succeed in the workplace. Dr. Barker described the "offensive conduct" as Dr. Key not speaking to her, ignoring her in the hallways, and not standing next to her a school events.[69] These are the same complaints echoed throughout Dr. Barker's grievance filed against Dr. Key with the school.[70] Such actions are not objectively offensive. Again, Title VII is not a "general civility code" and ignoring a colleague in the hallway simply does not rise to the level of severely hostile conduct which invokes Title VII protections.[71]

Finally, the evidence is clear that Dr. Key's actions did not unreasonably interfere with Dr. Barker's work performance. In fact, by all accounts Dr. Barker succeeded professionally while at LSMSA. In the three academic school years Dr. Barker was at LSMSA, she received a raise annually, was promoted from Instructor to Associate Lecturer, and received a stipend for work she did at the LSMSA Writing Center.[72] Dr. Barker's professional development was approved, and paid for, by LSMSA and its fundraising branch.[73] Dr. Barker was given multiple opportunities to

---

[67] *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020); *Harvill*, 433 F.3d at 435.
[68] Harris, 510 U.S. at 21, 114 S.Ct. 367.
[69] Exhibit A, p. 91-92; *Id* at Exhibit 2.
[70] Exhibit D.
[71] *Thornhill, surpra.*
[72] Exhibit A, p. 116.
[73] Id at 118.

attend national academic conferences and present her research while representing LSMSA.[74] Dr. Barker received favorable teaching reviews from her department.[75] Dr. Barker's own testimony proves that she did not let Dr. Key's alleged harassment affect her work place performance. Specifically, Dr. Barker testified as follows:

> Q:    Would it be fair to say that [Dr. Key] not talking to you, not acknowledging you, not standing next to you in events upset you but that you were able to do your job? You were able to teach your students? You were able to perform at the writing center, whatever it is that your job encompassed?
>
> A:    Yes, because I was not going to let that affect – like it could affect me as a person all it wants, but I'm not going to let it affect the work that I do for my students and with my colleagues and for the school.[76]
>
> …
>
> A:    I am good at what I do and always have been and always will be no matter what happens."[77]

Accordingly, a claim for sexual harassment secondary to a hostile work environment cannot be sustained.

### iv.    Defendant had appropriate sexual harassment policies in place but plaintiff failed to utilize them.

Furthermore, LSMSA cannot be held vicariously liable for the alleged harassment by Dr. Key since the school exercised reasonable care to prevent sexual harassment, and Dr. Barker failed to take advantage of the school's reporting system. An employer may escape liability for sexual harassment in the context of a hostile work environment if it can establish the *Ellerth/Faragher* affirmative defense; that (1) the employer exercised reasonable care to prevent and correct the harassing behavior, and (2) the plaintiff unreasonably failed to take

---

[74] Id at 118-121.
[75] Id at 54.
[76] Id at 85.
[77] Id at 122.

advantage of the preventive or corrective opportunities provided by the employer.[78] To properly assert the affirmative defense, the defendant must prove both elements.[79] The court will look to an employer's policies and programs to determine whether it took reasonable measures to prevent the alleged behavior.[80] The Fifth Circuit has consistently found the first prong of the *Ellerth/Faragher* defense to be met when a plaintiff admits that she knew about the policy, and when the court finds the policy to be reasonable.[81]

At all times pertinent to the Complaint, LSMSA had in place a policy entitled "Sexual Harassment – Title IX Policy" which was maintained in the LSMSA Handbook and on the on-line resource portal for the school.[82] The policy was updated annually and defined sexual harassment in detail. The policy further provides the following information on reporting suspected sexual harassment for any LSMSA employees:

> Any LSMSA employee who has reason to believe that sexual discrimination and/or harassment has occurred involves another employee must immediately make a verbal or written report of alleged incidences of sexual harassment to the Title IX Coordinator.[83]

The handbook also identified the Title IX Coordinator, their address, phone number, and email address.[84] Dr. Barker testified that she was aware of the policy and received training on all school policies annually as part of the fall teacher in-service training.[85] Dr. Barker did not report

---

[78] *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).
[79] *Casiano v. AT&T Corp.*, 213 F.3d 278, 284 (5th Cir. 2000).
[80] *EEOC v. Boh Brothers Construction Co., LLC*, 731 F.3d 444, 463 (5th Cir. 2013).
[81] *See, Pullen v. Caddo Par. Sch. Bd.,* 830 F.3d 205, 210 (5th Cir. 2016); *Giddens v. Cmty. Educ. Ctrs., Inc.*, 540 Fed.Appx. 381, 389 (5th Cir. 2013); *Williams v. Barnhill's Buffet Inc.*, 290 Fed.Appx. 759, 762–63 (5th Cir. 2008); *Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 162, 164 (5th Cir. 2007); *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 410 (5th Cir. 2002); *Casiano v. AT & T Corp.*, 213 F.3d 278, 286–87 (5th Cir. 2000).
[82] Exhibit F - LSMSA Handbook, "Sexual Harassment – Title IX Policy."
[83] Exhibit F, p. 31.
[84] Exhibit F, p. 30
[85] Exhibit A, p. 140-141.

the alleged harassment to the LSMSA coordinator. LSMSA can therefore meet the *Ellerth/Faragher* defense because it had a sexual harassment policy in place of which Dr. Barker was aware but did not utilize.

> **b. Plaintiff Cannot Meet Her Burden of Proof to Establish a Claim of Retaliation.**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action."[86] If the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to provide a "legitimate, nonretaliatory reason for the adverse employment action."[87]

> **i. Plaintiff Cannot Show She Was Engaged in A Protected Activity.**

First, there is no evidence to show Barker was engaged in a protected activity under Title VII of the Civil Rights Act of 1964. A "protected activity" under Title VII is defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."[88] Title VII covers two distinct types of protected activity: (1) opposition to any practice rendered unlawful by Title VII (the "opposition clause"), and (2) making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII (the "participation clause").[89]

In this matter, Dr. Barker filed a general grievance against Dr. Key citing Dr. Key's failure to speak to her in a professional setting. Dr. Baker *never* made allegations that the allegedly

---

[86] *Newbury*, 991 F.3d at 678 (citing McCoy v. City of Shreveport, 492 F.3d 551, 556–57 (5th Cir. 2007)).

[87] *Cooper v. Dallas Police Ass'n*, 278 F. App'x 318, 320 (5th Cir. 2008).

[88] *Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 830–31 (E.D. La. 2012) (citing *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003)).

[89] *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009).

harassing conduct was sexual in nature. She did not report any conduct to LSMSA that would invoke protections under Title VII nor did she include any such allegations in her written grievance. Dr. Barker attempts to justify her silence in this regard by explaining she did not want to "out" Dr. Key as being in the LGBTQ community. Specifically, Dr. Barker testified:

> A:    …[A]s somebody who identifies as part of that community, the last thing that you want is for somebody else – if you are – to out you.
>
> Q:    And when you say if you are part of the –
>
> A:    If you are – if you are- like if you are LGBTQ in some way and I was like if that is – if that was part of what Kristi's experience with me, it was not my place to have that conversation with anybody and not my place to say…
>
> Q:    So, it's your contention that you didn't report any of these concerns [unwanted sexual advances] … because you were worried about inadvertently outing Kristi Key? Is that –
>
> A:    Uh-huh.
>
> Q:    - correct?
>
> A:    Yep. And –
>
> Q:    Okay.
>
> A:    -- even though I'm a – you know, was accused of being a threatening and harassing person I didn't want to hurt another person.[90]

Because Dr. Barker made no allegations of misconduct under Title VII, she fails to make a prima facie showing of retaliation since she cannot prove she was engaged in a protected activity.

### ii.    LSMSA had non-retaliatory reasons for its actions.

Even if Dr. Barker was found to have engaged in protected activity by filing a general grievance, there were legitimate, non-retaliatory reasons for why LSMSA decided not to renew Dr. Barker's teaching contract. Specifically, the investigation into Dr. Key's grievance against Dr.

---

[90] Exhibit A, p. 94-95.

Barker was found to hold merit.

Dr. Key filed her grievance against Dr. Barker after it became clear that Dr. Barker would not adhere to the confines of the June 2019 agreement. Dr. Key noted that Dr. Barker paid careful and close attention to her comings and goings throughout the day.[91] Dr. Key testified that by the Spring of 2020 she felt the actions of Dr. Barker merited a hostile work environment.[92] After an extensive investigation into the claim, the LSMSA investigator concluded that Dr. Barker's actions were insubordinate and obsessive, and eroding the health and culture of LSMSA. Dr. Horton reviewed the investigator's file, including witness reports and hundreds of pages of communications between Dr. Barker and Dr. Key.[93] Dr. Horton concurred with the investigator's finding that Dr. Barker was creating an uncomfortable or hostile work environment for Dr. Key.[94] Dr. Horton agreed with the recommendations that Dr. Barker's contract not be renewed for the upcoming school year.[95] Accordingly, plaintiff's claim for retaliation must be dismissed.

### c.   Plaintiff has no evidence to support a claim under general negligence.

Dr. Barker has made general negligence claims against LSMSA for an alleged failure to comply with the statutory regulations of Title VII and Title IX. These claims fail as a matter of law as there is a complete lack of evidence to support the allegations. In discussing whether the school had properly posted notice of its non-discrimination policy, Dr. Barker testified, "I mean, honestly when I was there, I do not ever remember seeing it and at this point I can't tell you [one way or another]."[96]

LSMSA shows that at all times pertinent to plaintiff's claims, the school had appropriate

---

[91] Exhibit B, p. 27-28.
[92] Id at 35-36.
[93] Exhibit E, p. 98.
[94] Exhibit E, p. 141.
[95] Id.
[96] Exhibit A, p. 141-142.

Title IX policies in place and teachers were trained on them annually.[97] Even more importantly, LSMSA does not directly receive federal funding, which relieves them of statutory obligations under Title IX.[98] Despite this, efforts were undertaken by LSMSA in 2015 to comply with Title IX as LSMSA does receive *indirect* federal funds through Louisiana's Minimum Foundation Program.[99] Since plaintiff has no evidence to support allegations of general negligence, these claims should be dismissed.

### d. Plaintiff cannot Meet her Burden of Proof to Establish a Claim of Intentional Infliction of Emotional Distress.

First, since plaintiff has brought her claims against a state entity and "Louisiana has not waived its sovereign immunity for suits brought in federal court," the Eleventh Amendment bars plaintiff's state law claims.[100]

However, even if the Court were to consider the claim, to prevail on an allegations of intentional infliction of emotional distress, a plaintiff must prove: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[101] The first element requires that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[102]

---

[97] Exhibit E, p. 27.
[98] Exhibit E, p. 47
[99] Id.
[100] *Raj v. La. State Univ.*, 714 F.3d 322, at 329 (quoting *Richardson,* 118 F.3d at 453 (citing La. Rev. Stat. Ann. § 13:5106(A)(2010)); *Allain v. Bd. of Sup'rs of Univ. of Louisiana Sys.,* 2015 WL 6554440, at *4 (W.D. La. Oct. 29, 2015).
[101] *Brumfield v. VGB, Inc.*, No. CV 17-2223, 2018 WL 354294, at *6 (E.D. La. Jan. 10, 2018); *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. Sept. 9, 1991).
[102] Id.

Since the complained of conduct does not rise to the level of "objectively offensive," under the framework of a hostile work environment, Dr. Barker will certainly not be able to show LSMSA's actions meet an even higher standard of "extreme and outrageous." This is particularly true when the evidence proves that Dr. Barker made no report to LSMSA that she was the victim of sexual harassment. Accordingly, plaintiff's claims should be dismissed.

### e. Punitive Damages Are Not Warranted as Evidence Shows LSMSA Did Not Act with Malice of Reckless Indifference.

Dr. Barker seeks punitive damages in connection with her claims against LSMSA under Title VII. Of course, because Barker cannot establish a prima facie showing of discrimination, she is not entitled to damages. However, assuming *arguendo* that Dr. Barker could success on one or more of her claims, she will be unable to put forth evidence that the school acted with malice or reckless indifference sufficient to warrant punitive damages.

As the Fifth Circuit has recognized, proving punitive damages presents "a higher standard than the showing necessary for compensatory damages, satisfied in 'only a subset of cases involving intentional discrimination.'"[103] Under Title VII, punitive damages are recoverable only if the employer "engaged in a discriminatory practice ... with malice or with reckless indifference to [an employee's] federally protected rights."[104] The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.[105] Malice has been described as "evil motive or intent," and reckless indifference has been described as "a 'subjective consciousness' of a risk of

---

[103]*Henry v. CorpCar Servs. Houston, Ltd.,* 625 F. App'x 607, 614 (5th Cir. 2015); See also, *Boh Bros*., 731 F.3d at 467 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).
[104] 42 U.S.C. § 1981a(b)(1).
[105] *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118

injury or illegality and a 'criminal indifference to civil obligations.'"[106] Moreover, even if a particular agent acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show that it made good-faith efforts to comply with Title VII.[107] Given these stringent standards, a plaintiff faces a "formidable burden" in seeking punitive damages for employment discrimination.[108]

In this case, there is absolutely no evidence the school acted with malice or reckless indifferent. Dr. Barker made no attempts to report Dr. Key's actions to Dr. Horton until January 2020, at which point she was advised of her right to file a formal grievance per LSMSA's policies. Even then, Dr. Barker did not report she was the alleged victim of unwanted sexual advances by Dr. Key.[109] Throughout the subsequent investigation by LSMSA, Dr. Barker never revealed her belief that Dr. Key's behavior was "because of [Dr. Barker's] sex." Furthermore, the school had no reason to even suspect the interactions between Dr. Barker and Dr. Key were sexual in nature insofar as (1) there was never any physical or sexual conduct between the two women,[110] (2) Dr. Key was married to male faculty member,[111] and (3) Dr. Barker only discussed her sexual orientation with a few "close friends" at the school.[112] Moreover, even assuming Dr. Barker's allegations were true, LSMSA had an adequate policy in place which prohibits sexual harassment in the workplace.[113] Employees are provided training on sexual harassment annually.[114] Thus, by implementing this policy and providing training, LSMSA made a good-faith effort to comply with

---

[106] *Id.* at 536, 119 S.Ct. 2118 (quoting *Smith v. Wade,* 461 U.S. 30, 37 n. 6, 41, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).
[107] *E.E.O.C. v. Boh Bros. Const. Co.,* 731 F.3d 444, 467 (5th Cir. 2013) citing, *Kolstad,* 527 U.S. at 545–46, 119 S.Ct. 2118.
[108] Id.
[109] Exhibit A, p. 94-95.
[110] Exhibit A, p. 20.
[111] Exhibit B, p. 58.
[112] Exhibit A, p. 11.
[113] Exhibit F.
[114] Exhibit E, p. 27.

Title VII. There is no genuine issue of material fact as to Dr. Barker's inability to meet her "formidable burden" to warrant punitive damages in this matter.


## V.    CONCLUSION

There is no genuine issue of material fact regarding plaintiff's inability to establish her burden of proof in this matter. Accordingly, this Court should grant the Motion for Summary Judgment, dismissing plaintiff's claims against LSMSA, with prejudice, and at plaintiff's costs.


Dated:  July 31, 2023

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Sara G. White*
JAY P. ADAMS, Bar No.
SARA G. WHITE, Bar No. 34569
HUDSON, POTTS & BERNSTEIN, LLP
1800 Hudson Lane, Suite 300
Monroe, Louisiana 71201
Tel.: (318) 388-4400
Fax: (318) 322-4194
Email: jadams@hpblaw.com
Email: swhite@hpblaw.com
Attorneys for Defendant

</div>