UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

* * * * *

JUSTIN BARKER                )
                          )
VS.                        )   No. 1:21-CV-04419
                          )
LOUISIANA SCHOOL FOR MATH  )
SCIENCES & THE ARTS.      )

* * * * *

DEPOSITION OF

**DR. JUSTIN BARKER**

taken commencing at 1:40 a.m. on the 15th day of December,

2022, at Hudson, Potts & Bernstein, 1800 Hudson Lane, Suite

300, Monroe, Louisiana 71201, on behalf of the Defendant.

REPORTED BY:

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
CERTIFICATE NO. 91111
PARISH OF OUACHITA
STATE OF LOUISIANA

**CAROLYN F. WHITE**
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089



9

1    started the job at the Louisiana School, any other jobs in

2    between that?

3    A    No.

4    Q    Would you have started -- or when did you start at

5    Louisiana School?

6    A    I started August -- I think my contract started like

7    August 1 of 2017.

8    Q    Okay.  Are you on any kind of medication today which

9    may affect your testimony, either your ability to understand

10   my questions or your ability to answer?

11   A    I am on medication, but not that would fall into those

12   categories.

13   Q    Okay.  So, you feel comfortable --

14   A    Yes.

15   Q    -- being able to take --

16   A    Yes.

17   Q    -- to give a deposition today?

18   A    I do.

19   Q    Okay.  Have you ever been convicted of a felony?

20   A    I have not.

21   Q    Have you ever been involved in any prior lawsuit either

22   as a plaintiff or as a defendant?

23   A    No.

24   Q    Have you ever served as a witness in any other

25   lawsuits?

10

A    I have not.

Q    Have you ever -- I think you answered this, but you've not given any other depositions before?

A    No.

Q    Have you ever filed any other EEOC complaint other than the one we are here about today?

A    I have not.

Q    Have you ever filed for workers' comp?

A    I have not.

Q    Have you ever filed for bankruptcy?

A    No, I have not.

Q    Have you ever filed for disability?

A    I have not.

Q    Dr. Barker, we're here today on the lawsuit that you have filed against Louisiana School in which you have alleged that you were unlawfully harassed on the basis of your gender and your sexual orientation.  Can you tell me for the record, what is your gender?

A    I identify as female.

Q    And that's true at the time you were at Louisiana School?

A    Yes.

Q    And what is your sexual orientation?

A    I identify as queer.

Q    Is that true at the time you were at Louisiana School?

11

A    Yes.

Q    Did you ever tell anyone at the school -- and again I'm talking about Louisiana School, but the school of your sexual orientation?  Did you ever have any discussions with anybody?

A    Just a few of my close friends like just in casual conversation, but it wasn't something -- I wasn't like hi, my name's Justin and this is how -- so, no, if it came up or somebody like asked or kind of assumed, but --

Q    Yes.

A    -- yeah.

Q    Sometimes people talk about whether they are open or not open.

A    I am open.  Yes.  I'm out, open, yeah, so if it came up I wouldn't deny it, but I wouldn't like go and say -- that wouldn't be the thing I led with, so --

Q    Sure.  I understand that.

A    -- yeah.

Q    And so I keep talking about at the time you were at the school and so I'm talking -- I guess I think about it in school years.  So, the school year starting in 2017 through the school year that ended in the spring of 2020 --

A    Uh-huh.

Q    -- would you agree that you were an openly queer --

A    Yes.

13

1  and then whoever else knew from like students or whatever.

2  Q    Can you tell me how John Allen became aware of the fact

3  that you identified as queer?

4  A    I told him.

5  Q    When was that?

6  A    Explicitly it was -- I think it was around the fall of

7  2019.

8  Q    Fall of 2019.  Where were y'all or how did it come up

9  if you remember the conversation?

10  A    We were -- we used to just chat, so I think we were

11  chatting either in his office or like outside -- like in his

12  office and we were talking about just, you know, how his

13  stuff is going like his relationships and I was just like oh

14  yeah, like I don't think I've ever explicitly said, but

15  here's the thing and he was like well, I didn't really --

16  like that's awesome, yay and I was like yeah, like I've

17  always -- but it's not something I ever led with, so but it

18  just kind of came up and I was like yeah, it's a thing.

19  Q    So, it's a thing meaning that you were queer?

20  A    Yes, exactly.

21  Q    Okay.  All right.  What about Kristi Key?  How do you

22  know that Kristi Key was aware of your sexual orientation?

23  A    I -- my assumption -- I never directly told her, but my

24  assumption is based on some of the conversations that she

25  had with me and some of the things that she would say that

17

1  A    If I think of something as we're going through can I --

2  can I -- because I'm trying to like go through the timeline,

3  but yeah, not currently --

4  Q    Yeah.  And --

5  A    -- off the top of my head.

6  Q    And again if you don't know, if you don't remember --

7  A    Okay.

8  Q    -- those -- I always say those are fair answers, so

9  again if you can't think of anything more that's a fair

10  answer as well.  So, employees at the school who were aware

11  of your sexual orientation include Jenny Schmidt, Jennifer

12  Mangum, Karen Stirrett --

13  A    Stirrett.

14  Q    -- Kim Cain, John Allen and you believe Kristi Key.  Is

15  that correct?

16  A    Correct.

17  Q    Although you never had a direct conversation with her

18  where you said I identify as queer?

19  A    Correct.

20  Q    Anybody else at the school during your time at

21  Louisiana School that knew your sexual orientation?

22  A    Students -- pretty much all the students.  I -- again,

23  I would assume.  Like I know the ones that took classes with

24  me most likely did.  One even came up to me and -- after a

25  class and she said I'm just grateful that like you do --

20

A     Yes.

Q     Would you agree that points one through 30 detail the harassment that you contend was perpetrated by Dr. Key in this matter?

A     Yes.

Q     Okay.  If there was another significant allegation or harassment, would there be any reason why you would not have included it in this list?

A     No.

Q     Okay.  So, it's -- I guess if we're working off of something it's fair to say that we can work off of number one through 30 as really the full extent of the harassment you're alleging occurred by Dr. Key?

A     Yes.

Q     Okay.  Now, I think I know the answer to these questions after -- after reading your discovery responses, but I do have to ask.  Did you and Dr. Key ever engage in a physical, sexual -- any kind of physical, sexual conduct?

A     No.

Q     Okay.  Did Dr. Key ever ask you to engage in physical, sexual conduct?

A     No.

Q     Did Dr. Key ever tell you that your job depended on your willingness to engage in a physical, sexual relationship or physical, sexual conduct with her?

21

1  A    No.

2  Q    Okay.  Did Dr. Key ever ask you to be in a romantic

3  relationship with her?

4  A    No.

5  Q    And I say romantic relationship meaning not -- or an

6  emotional relationship even without physical acts?

7  A    No.

8  Q    Okay.  Did Dr. Key ever tell you that your job depended

9  on your willingness to enter into a romantic relationship

10  with or without physical acts with her?

11  A    No.

12  Q    Okay.  Dr. Key testified in this case yesterday and

13  described for us during your first year at Louisiana School

14  -- and again I'm using year as like school year is how I

15  think of it --

16  A    Uh-huh.

17  Q    -- that y'all had developed a friendship.  Would you

18  agree with that description?

19  A    Yes.

20  Q    There were also some I guess for lack of a better word

21  descriptions in some of the attachments to your discovery

22  responses that talk about Dr. Key being a mentor to you.

23  Would you agree that Dr. Key at least in that first year

24  acted as a mentor for you?

25  A    Yes.

23

1  of like saying no, the fact that she messaged me the first

2  thing in the morning and the last thing at night and it's a

3  constant thing, the fact that, you know, she gives me gifts,

4  the fact that -- like all of these things I just kind of

5  kept putting off and dismissing.  So that's what I mean by

6  for the most part because there were things that again in --

7  in the moment were like um, like struck me as a little odd,

8  but in hindsight I now recognize that they were more

9  problematic than just odd.  Yeah.

10  Q    Okay.  Thank you.  Did Dr. Key ever tell you that your

11  job depended on your willingness to be friends with her?

12  A    No.

13  Q    During that first school year -- and again I'm talking

14  about August of '18 into this -- no, August --

15  A    '17.

16  Q    -- of '17 into the spring of '18, did you ever report

17  or tell anyone that you did not want to be friends with

18  Dr. Key?

19  A    No.

20  Q    Or that the friendship with Dr. Key made you

21  uncomfortable?

22  A    I did express in June of 2018 -- John Allen was aware

23  that there was an -- so, Dr. Key all of a sudden stopped

24  speaking to me in any capacity and -- and it wasn't just,

25  you know -- it wasn't -- when I say any capacity I mean,

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089

28

1    -- with this -- where the students were she would not look

2    at me, she would not engage me, she would not even -- like

3    even in a professional manner.

4    Q    Is this the STEM?

5    A    Yes, correct.

6    Q    Okay.  I've seen that reference.

7    A    Uh-huh.

8    Q    So, this is during STEM week and you think it happened

9    maybe that Friday?

10   A    Yes.  And the meeting that she and I had was at the end

11   of that week.

12   Q    Okay.

13   A    And so we talked about -- I wanted clarification again

14   like what -- as a new faculty member -- first of all, I was

15   like what did I -- I wanted to know what happened, what I

16   did wrong, like what the issue was.  She said that she --

17   she had been a bit -- bad mentor to me and that she just

18   needed to just do -- be better about like not talking with

19   me about, you know, my colleagues and that we needed to

20   establish that boundary and my response to that was like I

21   am totally fine with that.  Like I don't want to talk about

22   my colleagues like I don't want to be caught up in that

23   moment and like that's not -- that's not how I play, so I

24   told her 100 percent like --

25   Q    So --

29

A      -- I did not have issues.

Q      So, 100 percent you agreed to setting at least that professional boundary with her?

A      Yes.  Yeah.  And that was --

Q      So --

A      -- the only -- yeah.  And that was the only --

Q      We're starting to talk over each other, so --

A      Yeah, I'm sorry.

Q      -- I apologize so you finish -- go ahead and finish your answer.

A      And sometimes I get like -- (inaudible) when I get like really excited.

Q      I understand.

A      So, yes.  So, she -- that was the only boundary that we discussed was not talking as she put it dishing about colleagues and I said I agree.

Q      Did she mention anything about concerns that Dr. Langford had?

A      No.  No.

Q      So, going into your next school year at the school, which would have been '18 to '19, at that point, the fall of '18, can you describe for me your friendship, relationship, whatever you contend was there with Dr. Key at that point? Or did you even still consider Dr. Key a friend at that point?

49

Q    Okay.  All right.  So, I wanted -- we're going back to
the spring.

A    Uh-huh.

Q    If I understand your testimony correctly you had no
meetings with Sheila Kidd up until the June 2019?

A    Correct.

Q    March 21, 2019, was there a second meeting between you
and Dr. Key to discuss setting some professional boundaries?
I've also read in some of the messages it being described as
finding middle ground.

A    Yes.  That meeting happened on the suggestion of John
Allen because Dr. Key -- we had been having difficulties
again.  She had been in front of John Allen -- and again
there are -- John -- Mr. Allen recognized this -- had gone
out of her way to ignore me and also prevent in one case
John from actually speaking to me and it had gotten to the
point where I -- I started to think -- it was happening in
front of other people and I thought ew, if I see it and
doing it in front of John Allen or Dr. Langford or whomever
like other people are going to see it and I also still had
no idea like what I had done professionally or honestly
personally to like really -- because we never had a
conversation.  Like the things you asked a minute ago about
that letter, none of the -- like that conversation never
happened.  Nobody ever -- even though I asked like can

56

1

Q    Okay.

2    A    -- looked at him because I'm referencing -- like if you

3    had said something I would look at --

4    Q    Okay.

5    A    Yeah, uh-huh.

6    Q    So, I think I understand what happened in the March

7    21st meeting.  Is it fair to say that you wanted explicit

8    boundaries, you agreed that boundaries were needed?

9    A    Uh-huh.

10   Q    Sorry, that's a yes?

11   A    I'm sorry, yes.

12   Q    But you left that March meeting -- would it be fair to

13   say you were unclear on what -- where the boundaries lay?

14   A    Yes.

15   Q    Did Dr. Key ever give you any explicit boundaries

16   during the March 21st meeting that she felt comfortable

17   with?

18   A    No.  She only said I cannot and will not ever be able

19   to establish boundaries with you and I didn't know how to

20   respond to that.

21   Q    So, at that point in March of '19 do you still consider

22   Dr. Key to be a friend?

23   A    No.

24   Q    Okay.  Would you -- I guess was it fair to call that

25   maybe the turn of the end of the friendship?

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089

61

1   dates and stuff.  It's a thing.  It was a Wednesday, June

2   6th at like 9:00 a.m. and she's like I want to speak with

3   you and Dr. Key regarding some communication concerns that

4   have arisen.  Again, like it's almost word for word, but I

5   can't remember it exactly and my response was okay and I

6   assumed that we would sit in a room and like talk through

7   this stuff and come to some kind of -- essentially have a

8   mediation I guess and come to some kind of like I understand

9   what -- so I could have better clarity about like what she

10  was doing and then what like her intentions were or I guess

11  are at that moment and so that I could explain, you know,

12  where I'm coming from and so that we could foster a -- a

13  good professional relationship where -- because I even said,

14  like I still want you to mentor me because like my ultimate

15  goal was not to remain a teacher.  Like I've always been

16  interested.  I mean, I'm -- I work at the State now.  Like

17  I've always been interested in moving up either in an

18  administrative role or beyond that like working for a state

19  agency just because like I -- while I love teaching, I -- I

20  also wanted to do more with education and so I still wanted

21  to learn from her because I was like, you know, from all

22  I've been able to see like you're -- you seem effective at

23  your job and like, you know, there's no other -- like we

24  don't have like another Dean of Faculty or Dean -- like

25  anybody else I could engage with, so I want to -- so I did

62

1    -- I did state that I believe in the letter and I was under

2    the impression that yeah, it would be Kristi, Sheila and me

3    -- I'm sorry, Dr. -- Kristi, Sheila and me --

4    Q    Yeah.  I know who you're talking about --

5    A    -- and we would sit and work all this out --

6    Q    And --

7    A    -- and talk about these communication concerns.  And

8    then Wednesday morning --

9    Q    Can I ask you a question --

10   A    Yes.

11   Q    -- real quick?

12   A    Of course.

13   Q    Because I want to let you keep going, but I want to

14   make sure I understand.  You wanted that meeting to happen,

15   correct?

16   A    Uh-huh.

17   Q    I'm sorry, and that's a yes?

18   A    Oh, yes.  I'm sorry.

19   Q    That's okay.

20   A    I knew that.

21   Q    And you wanted to set some boundaries?

22   A    Yes.

23   Q    In a professional and personal aspect?

24   A    Yes.

25   Q    And I understand you wanted the friendship to end?

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089

63

1

A      Yes.

2      Q      But you wanted her to still serve as a mentor to you?

3      A      Yes.

4      Q      And that's what you wanted to accomplish going into

5      this meeting --

6      A      Yes.

7      Q      -- with Sheila Kidd and Dr. Key?

8      A      Correct.  Yes.

9      Q      And I understand a meeting between the three of y'all

10     did not take place?

11     A      It did not.

12     Q      So, at some point you did meet with Sheila, correct?

13     A      Yes.

14     Q      And I think that's what you were wanting to describe

15     for me.  So, I don't -- again, I don't want to cut you off,

16     I just want clarity.  So, tell me what happens in the

17     meeting with you -- between you and Sheila?

18     A      Yeah.  And I'll say like I talk sometimes really fast

19     so at any --

20     Q      That's okay.

21     A      -- point if I keep -- I mean, yeah.

22     Q      That's okay.

23     A      So, that morning -- so I think the meeting was around

24     9:00 and around 8:15 to 8:30 I got another e-mail from

25     Sheila saying that the meeting had been moved to her office.

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA  71294
(318) 396-7089

71

A    You're totally fine.

Q    So, did you sign it?

A    I did sign it.

Q    This is your signature?

A    Absolutely.

Q    And at that point you wanted some boundaries, correct?

A    I did, yes.

Q    Did you -- and so you agreed to these boundaries although you have testified I believe that you thought these were a list of informal directives?

A    Yes.

Q    But at least at the time in June '19 you did agree to these?

A    Ultimately because I didn't think I had any other choice.  I -- when HR calls you in and tells you hey, you -- you're threatening and harassing, you've done all these things wrong and there was no -- there was no willingness to like listen to me, right.  Like I was trying to explain, this is -- and there was -- there -- and it just -- Ms. Kidd just kept coming back to but do you not understand what you did wrong.  No, I don't.

Q    In that meeting did you ever tell Ms. Kidd that you could see that some of your actions towards Dr. Key could be perceived as harassing?

A    No.  No.

91

1    A    Yeah.

2    Q    -- and I just want to redirect us so that we can get

3    through this material.

4    A    Uh-huh.

5    Q    You kind of alluded to what you had told John Allen --

6    A    Uh-huh.

7    Q    -- and when you had told John Allen and again, I want

8    to go back to the discovery responses that are very detailed

9    and I think it's on page six where you talk about in detail

10   exactly what you told John Allen and when you -- when you

11   say that you -- when you spoke to John Allen -- I think it's

12   six and seven.  It's in answer to interrogatory number four.

13   It says John Allen and it has several dates after it.  Do

14   you see where I am?

15          MS. MAI:  And what page are you?  Sorry?

16          MS. WHITE:  I think six.  This, of course, is not

17   numbered.

18   A    Oh, okay.  I know where --

19   Q    But where you --

20   A    -- you're at.  I'm almost there.  I think I just passed

21   it.

22   Q    I guess -- I don't want to ask anything about it

23   specifically, but I want to I guess in general kind of like

24   when we talked about the harassment, would you agree that

25   this response, which again is bullet pointed, but not

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089

92

1    numbered --

2    A    Uh-huh.

3    Q    -- covers the extent of the information that you

4    reported to John Allen regarding Kristi Key's actions?

5    A    Yes.  I provided -- yeah.  Every meeting -- yeah, and

6    some of the things I messaged him as well that I provided in

7    the -- like the discovery.

8    Q    And again, generally this is that Kristi or Dr. Key was

9    not talking to you, was ignoring you, was not standing next

10   to you at events, basically behavior which you have just

11   described for us?

12   A    Uh-huh.

13   Q    Correct?

14   A    Yes.

15   Q    Would you agree -- and again I think I know the answer

16   after reading -- and it goes onto the second page.

17   A    Uh-huh.

18   Q    At no point in time did you ever report to John Allen

19   that you felt there were some unwanted sexual advances?

20   A    No.

21   Q    Okay.  And that's a poor question on my part the way

22   that I postured it.

23   A    But I know you, yeah.

24   Q    Yeah.  So, did you ever tell John Allen that you were

25   the victim of unwanted sexual advantage --

93

1   A    No.

2   Q    -- advances?

3   A    And the reason -- I can explain exactly why.

4   Q    And I have a few more -- and I want --

5   A    Okay.

6   Q    -- you to explain.  Did you ever tell John Allen that

7   Dr. Key had requested sexual favors from you?

8   A    No.

9   Q    Did you ever tell John Allen that there was any

10  inappropriate physical contact with Dr. Key?

11  A    At that point let me think.

12  Q    And I -- let me --

13  A    No.

14  Q    -- posture it with physical, sexual contact?

15  A    No.

16  Q    Okay.

17  A    No.

18  Q    And you wanted to give some context.

19  A    Yes.  I lost my train of thought.

20  Q    If it comes back to you we can come back.  But again

21  you would agree that your discovery responses pretty well

22  encompassed the information that you provided to John Allen?

23  A    Yeah.  And I got it back, okay.

24  Q    No problem.

25  A    It usually only takes a minute.  So, the reason I

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA  71294
(318) 396-7089

94

didn't is by that point -- because this was -- and I would

say definitely I mean -- I would say by October of --

October 24, 2019, that's when I kind of like -- I kind of

started put together the full picture like after my

conversation with Kim Cain after I went back and looked at

everything and thought about everything and my concern --

like as somebody who identifies as part of that community,

the last thing that you want is for somebody else -- if you

are -- to out you.

Q    And when you say if you are part of the --

A    If you are -- if you are -- like if you are LGBTQ in

some way and I was like if that is -- if that was part of

what Kristi's experience with me, it was not my place to

have that conversation with anybody and not my place to say

like -- and now I'm like well, Justin, you were like being

too nice to her.  You should have just said what you thought

and maybe -- well, I probably would have ended up in the

same situation but whatever.

Q    So, it's your contention that you didn't report any of

these concerns to John Allen because you were worried about

inadvertently outing Kristi Key?  Is that --

A    Uh-huh.

Q    -- correct?

A    Yep.  And --

Q    Okay.

95

A      -- even though I'm a -- you know, was accused of being

a threatening and harassing person I didn't want to hurt

another person.

Q      Okay.  So, in February 2020 -- again so now we've moved

through the fall of '19, we're in the spring of 2020.  You

went to go speak with Dr. Horton, correct?

A      Yes.

Q      Okay.  And this was the day after Jenny Schmidt had

gone to speak with Dr. Horton?

A      Yes, which I did not know about until she told me.

Q      Okay.  So, you didn't ask Jenny to go?

A      No.

Q      But Jenny went, advocated for you?

A      Since nobody else was, so --

Q      And then the next day you went to Dr. Horton?

A      And the reason I went is because I don't like people

speaking for me.  I mean, I wasn't mad at Jenny, but I don't

like -- and I wanted to have the chance to say here is it

from -- from me.  Like I appreciate that Jenny broke the ice

because I didn't -- I couldn't do it and it had gotten to

the point where yeah, like -- I spent I would say 75 percent

of my day feeling like there was just like something sitting

on my chest constantly.  Like I was always anxious, I was

always on edge and it just -- again, it became untenable and

so I -- when I went to speak with Dr. Horton I brought Jenny

116

1

second year - you were worried about Dr. Key's behavior

2  affecting your job.

3  A    Yes.

4  Q    Is that correct?

5  A    Correct.

6  Q    In the three years that you were employed at Louisiana

7  School -- and again I'm using academic years.

8  A    Uh-huh.

9  Q    Did you receive a raise each year you were there?

10 A    Yes.  It is standard, like everybody receives one, so

11 yeah.

12 Q    Did you receive a promotion from instructor to

13 associate lecturer during your time at Louisiana School?

14 A    Yes.

15 Q    Did you receive a stipend for the work that you did on

16 the writing center?

17 A    Yes, thanks to Dr. Donlon.

18 Q    Okay.  And that was my next question.  Do you know who

19 advocated --

20 A    Yeah.

21 Q    -- for you to get the writing center?

22 A    Dr. Donlon.

23 Q    Was it your understanding that only Dr. Donlon

24 advocated for you?

25 A    Yes.

140

1

Q    Okay.

2  A    That's what I'm going for and then again somebody who

3  does -- I like CBT.  I like cognitive behavioral therapy

4  more than anything else, so like I know what I want.  It's

5  just haven't found one yet.

6  Q    Okay.  Shifting around a little bit and I'm trying to

7  wrap it up.  I know we are getting late in the day here.

8  Your first year at the school, '17 to '18, did you attend an

9  in-service training on Title IX?

10 A    Yes.  Part of in-service.

11 Q    Did you attend some in-service training on Title IX the

12 beginning of your second year -- academic year, '18 to '19?

13 A    I'm assuming, yes, because I think it was always part

14 of in-service.  There was always like a Title IX

15 presentation, so yeah.

16 Q    Okay.  And same question for third year.

17 A    I would say yes, given that my understanding is always

18 -- I mean, they all go together, but yeah.

19 Q    If there was a required training, would it be fair to

20 say that you went?

21 A    Huh?

22 Q    If there was a required --

23 A    Sorry.

24 Q    -- training for you as a teacher at Louisiana School,

25 would it be fair to say that you would go to it?

141

A    Oh, 100 percent, yeah.

Q    You can't fit -- there's no instance that sticks out in your mind of a reason that you did not go to a required training of some sort?

A    No.

Q    Okay.  There's also been some questions about the notice of non-discrimination at the school.

A    Yes.

Q    Can you tell me what information you base that allegation on, about a failure to post or distribute the notice to non-discrimination?

A    Yeah, because as a faculty member, that -- that was never something that like we were told like here's where you -- I mean, like you find out where it is.  I mean, I don't even -- I guess it might be where like some of the employment stuff is like you'll have through the -- like by the business office, but like I don't know if there's actually a notice of discrimination.  That was never something like hey, you know, if you have questions you can find the notice of discrimination here in this place or over here.  Like that was never explicitly told -- told to us.

Q    Okay.  So, it wasn't explicitly told to you, but you're not saying that it's not there?  Or maybe you are saying that it's not there?

A    I mean, honestly when I was there I do not ever

142

remember seeing it and at this point I can't tell you --

Q    One way or the other?

A    Yeah.  But it was never something like that jumped out

at me like oh, yeah, there's our notice of discrimination.

Q    Okay.  There's also an allegation in the complaint

about intentional infliction of emotional distress.

A    Uh-huh.

Q    It says in there that the defendant or the school

forced confidentiality on you and retaliated against you

when you sought emotional and professional support from

close colleagues,.

A    Uh-huh.

Q    Can you tell me what you mean by that?

A    Yes.  In Dr. Key's grievance while she accuses me of

being a, quote, "personal stalker and workplace harasser" at

the end of the day what she ultimately says at the end of

her grievance is that she would like me dismissed because of

my issues with confidentiality.

Q    Okay.

A    So, she makes that direct connection back.

Q    And so her -- her statement, her request for relief in

her grievance that she wanted you dismissed because of

issues with confidentiality --

A    Uh-huh.

Q    -- is what you are referencing in that intentional

149

1  Q    Did you think that you were on a date - and I use that

2  in the romantic sense --

3  A    Uh-huh.

4  Q    -- with Dr. Key?

5  A    I didn't, but I can't --

6  Q    Okay.

7  A    -- tell you what she thought.

8  Q    Okay.  The Toledo Bend incident -- again, I don't want

9  to go too much in depth, but did -- is this the event -- did

10 it occur -- was it one weekend or one day?

11 A    It was a day.  Yeah, a day.

12 Q    And was Dr. Key there with her family?

13 A    Uh-huh.

14 Q    I'm sorry, that's a yes?

15 A    Yes.  I'm sorry.

16 Q    Did you go with a friend as well?

17 A    Yes.  Dr. Key was messaging me that day.  I was

18 actually with Jenny Schmidt because it was over Spring Break

19 and Dr. Key wanted me to come out and I told her I was with

20 Jenny and so Jenny came, too.

21 Q    Okay.  Did you spend the night at Toledo Bend?

22 A    No.  No.

23 Q    You didn't spend the night?

24 A    No.

25 Q    Did Kristi spend the night with her family or do you

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JUSTIN BARKER                          CASE NO.: 1:21-cv-04419

VERSUS                                 JUDGE DRELL

LOUISIANA SCHOOL FOR MATH,             MAGISTRATE JUDGE
SCIENCE, AND THE ARTS                  PEREZ-MONTES

## RESPONSE TO INTERROGATORY NO. 1:

Please state the name and employment position of each person whom you contend harassed you at LSMSA.

Response: Dr. Kristi Pope Key, Director of Academic Services.

## RESPONSE TO INTERROGATORY NO. 2:

For each person whom you contend harassed you, please describe the harassment, including all facts upon which you base your contention that you were unlawfully harassed.

Response: Dr. Kristi Pope Key

Initial Harassment

1. Dr. Key first tried to engage me outside of work via Facebook messenger starting my first semester at LSMSA in early September 2017, October 2017, and again in December 2017.

2. From December 2017 onward, Dr. Key and I began to talk frequently. At first, she mostly messaged me on Facebook and iMessage; she then started messaging me primarily using Gchat, and she would sometimes send me Instagram DMs. In her first Gchat to me on February 5, 2018 at 10:22 am, she sent, "Is this a thing you do? Gchat? With the history settings turned off???" Before I had a chance to respond, she had turned our chat history settings off, meaning that all our messages would disappear after 24 hours. And given that she was my supervisor, I didn't feel comfortable asking her to turn the settings back on or turning them on myself.

3. In another message, from February 2018, when I suggested we invite another colleague and his partner to join us for Black Panther, she responded, "POTENTIAL DOUBLE DATE!"

4. One evening in March 2018 when Dr. Key and I were Gchatting, she sent me a message that said, "I hope you never leave. I want you to stay here for four forevers." In another message from around the same time, she told me once again that she never wanted me to leave.

EXHIBIT

2

PENGAD 800-631-6989

5. In April 2018, she sent me a message that read, "I am glad you're in this world." And in yet another message, from April 2018, she asked if we had a "shipper name" for "Carrie and Laura" (from Star Wars).

6. She would also send messages with "Was JUST thinking of you" or "I saw your car just now."

7. In another instance, when I had messaged her about whether she was upset with me about something, she responded that it had nothing to do with her "Justin-related feelings."

8. In addition to the constant messaging on multiple mediums, Dr. Key would suggest we take trips together, make me food (telling me at one point that's how she showed she cared), and give me notes and gifts, including a magnet with a uterus drawn on it.

9. Between January 2018 and May 2018, she invited me over to her house on several occasions and to Toledo Bend (she later gave me a magnet with a picture of the cabin at Toledo Bend on it).

10. She would constantly comment on and compliment what I was wearing, give me long hugs, and find reasons to touch me. For example, in March 2018, Dr. Key and I were sitting at the bar in her kitchen discussing English course scheduling when she reached over and laid her hand on my wrist and told me she liked my bracelet. She left her hand there a few seconds more before pulling it away.

11. Another time, Dr. Key and I had walked out of the faculty lounge into the hallway where we ran into another faculty member. As we were talking, Dr. Key, who was standing to my left, reached around and started to play with or fix my collar. She just kept fiddling with it, and I started to become uncomfortable until she pulled her hand away. When we parted ways, Dr. Key squeezed and kind of rubbed my upper arm as she said goodbye. She didn't do the same to the other female faculty member.

12. Additionally, Dr. Key would often talk to me about her personal feelings. For example, on August 15, 2018, we walked to Starbucks after lunch to grab coffee for her birthday. She wanted to sit and talk at Starbucks, and for over an hour, she talked to me about her personal feelings and concerns— she shared that she cared too much what people thought of her and that it was taking an emotional and physical toll on her. She also told me that she doesn't know who she is as a person and that she has a lot of inner conflict. I didn't know what she meant by any of this conversation, so I simply listened and told her I was sorry and hoped she figured it out. She repeated it again several more times, and I just kept telling her I would listen whenever she needed me to. Finally, we walked back to her office where she opened her birthday present. She then proceeded to walk around her desk and give me an uncomfortably long hug (about a minute, if not a little longer) and tell me how glad she was that I was there with her.

13. Another time, in July 2018, when we were driving back to campus from lunch, she supposedly received a message from her father. He apparently sends her Bible verses regularly, which she hates. She then started talking to me about her father and how when she was growing up, he was a "philander" who "got blow jobs from every woman in town." She told me that while he was out sleeping around, he'd tell her that she was a sinner and going to hell for just drinking alcohol.

14. Between March 2018 and December 2019, she would invite me to work with her in her office or would offer her office to me when she wasn't there.

15. In October 2019, after not speaking with me for a period of time, Dr. Key saw me at the water fountain and said, "hey boo."

16. I would often catch Dr. Key staring at me during events, activities, and meetings. A few other colleagues (particularly Karen Stirrett and Jennifer Mangum) noticed, as well, and asked me/expressed their concern about it.

Ongoing Harassment & Toxic/Hostile Workplace Environment

17. In May/June 2018, Dr. Key stopped speaking to me in any capacity. Dr. Key was my supervisor, and both were scheduled to co-teach two classes during STEM, a weeklong summer program which Dr. Key specifically asked me to co-teach rather than another STEM professor or coordinator. There was no explanation for this sudden change in behavior until later when Dr. Key told me that she needed to "recalibrate" when it came to me.

18. In July 2018, Dr. Key began randomly texting me one Sunday afternoon and proceeded to text with me for over seven hours until about 11:00 pm that evening. She then invited me out to lunch that Tuesday, where she brought up a series of rumors about me leaving, as well as rumors about my colleague and friend, Ms. Merrill (Schmitt) and her relationship with a former LSMSA employee. During this conversation, I told Dr. Key that the rumors were complete lies, that I had already heard about them, and that the individual spreading these rumors used to work for Ms. Merrill (Schmitt) and left on less-than-positive terms. After returning to campus, Dr. Key sent me a series of bizarre Gchats in which she "re-scripted" our earlier conversation and apologized for messing it up.

19. By September 28, 2018, I had become increasingly more uncomfortable and worried about how Dr. Key's behaviors and interactions would affect my job, so I sent a text message to Dr. Key asking about personal boundaries. Dr. Key's only reply was "I have decided to deliberately try not to dish with you about colleagues."

20. On multiple occasions, Dr. Key was actively hostile toward me, often in front of my colleagues and students. Additionally, by Fall 2019, Dr. Key became increasingly hostile to my close colleagues and friends, particularly Dr. Karen Stirrett, a new biology instructor. Dr. Stirrett resigned from the school after only that first year of teaching due to Dr. Key's behavior, stating in her resignation email that Dr. Key was the reason for her departure.

21. On September 18, 2018, during a group conversation among colleagues at a reception for Governor Edwards, Dr. Key would not speak to me or even look at me. However, later that night, Dr. Key began messaging me on Instagram asking me if she received the cat gift she had left in my mailbox earlier that morning.

22. Also in September 2018, Dr. Key told me that in May 2018, Dr. Key had to do an "emotional dump" and "recalibrate her feelings" regarding me.

23. In November 2019, at a conference in Seattle which was attended by Dr. Key, me, and other members of LSMSA faculty, Dr. Key refused to stand with the LSMSA representatives during group events because I was present.

June 6, 2019

Exhibit A

This letter serves as official notification of professional expectations of behavior and correspondence between you and Dr. Key moving forward.

- Any future correspondence or conversation that attempts to engage in personal questions regarding individual feelings, past concerns about interactions or actions, or intrapersonal encounters (or the lack thereof) will further signal an ongoing and consistent unwillingness to respect both professional and personal boundaries. Demonstrations of such lack of respect will result in an escalation of Human Resources concerns and lead to disciplinary actions.

- Should Dr. Barker choose to stay on the job market or to go on the job market again, she should address any questions about that process or raise any concerns about that search with her immediate Chair. It is not to come to Dr. Key's desk in any fashion. Any concerns Dr. Key may have about her continued employment at LSMSA will be communicated officially through appropriate channels to Dr. Barker, Mrs. Kidd, and Dr. Horton in particular.

- No contact via letters, notes, social media, gchats, or text. All outreach and correspondence should take place via LSMSA email and should be only professional in nature.

- No private meeting requests will be entertained. Face to face meetings on professional matters will include either Sheila Kidd or another third party designee (likely Dr. Jocelyn Donlon as current Chair).

I understand the parameters and directives included above and understand the potential for future disciplinary action for cause.

*Justin L. Barker*



EXHIBIT

3

PENGAD 800-631-6989