UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JUSTIN BARKER

VERSUS                              NO. 1:21-cv-04419

JUDGE DRELL

MAGISTRATE JUDGE PEREZ-MONTES

LOUISIANA SCHOOL FOR MATH,

SCIENCE, AND THE ARTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

DR. KRISTINA POPE KEY

December 14, 2022

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Taken At The Law Office Of:

Hudson, Potts & Bernstein

1800 Hudson Lane, Suite 300

Monroe, Louisiana 71201

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Reported By:

PEPPER ROBERTSON

CERTIFIED COURT REPORTER

CERTIFICATE NO. 2010026

PARISH OF OUACHITA

STATE OF LOUISIANA

1

**Copeland Court Reporters**
**(318) 387-2889**

EXHIBIT
B

1    the police station.

2         Q    When you say downtown, do you have an address or

3    approximate street name, location?

4         A    Downtown Natchitoches.

5         Q    Are there multiple police stations, do you know

6    which area of the strip?  I mean, is it Front Street, any

7    ordinal direction of downtown Natchitoches?

8         A    I believe it is two blocks off of Front Street.  I

9    don't know--I don't know the cross street.

10        Q    Okay.  Who did you speak with at the Natchitoches

11   Police?

12        A    I don't recall.

13        Q    What did you tell the Natchitoches Police?

14        A    That I had filed an HR grievance against a coworker

15   and I was concerned because she knew where I lived and I

16   wasn't sure if I should take any other steps necessary.

17        Q    Did you share any additional information with them

18   concerning the details of what your concerns were?

19        A    As I recall, my primary concern was her awareness

20   of my movements around campus.

21        Q    You were concerned that Dr. Barker knew about your

22   movements around campus?

23        A    Yes.

24        Q    Can you explain what that means?

25        A    It was my experience that Dr. Barker paid careful

27

**Copeland Court Reporters**
**(318) 387-2889**

1    and close attention to my comings and goings throughout the

2    day.

3         Q     And what is that experience?

4         A     What do you mean, what is that experience?

5         Q     You said it's been your experience that she notices

6    your comings and goings throughout the day.  I want to know

7    what your experience is, like give me an example.

8         A     Sure.  During that--during that season, early 2020,

9    I experienced that Dr. Barker noted when I was or was not in

10   my office, when I was or was not moving up and down the

11   hallways, and she had expressed discomfort in writing.  I'm

12   sorry.

13        Q     I was listening to what you were saying.  You said,

14   or I believe you said, she noted when you walked down the

15   hallways.  How did you note that she noted that or how did

16   you know that she noted this?

17        A     I have correspondence via email where Dr. Barker

18   noted if I spoke to another faculty member but not her or if

19   I spoke to Mr. John Allen but not her.

20        Q     Okay.  But walking down the hallways, you would be

21   speaking.  Is that what you're referring to?

22        A     Uh-huh (yes).

23        Q     Other than that, was there any other issues that

24   you had, other than where you may have been on campus?  Now

25   let me back up a little bit.  As the director of academic

28

**Copeland Court Reporters**
**(318) 387-2889**

```
1       A     There is no tenure.
2       Q     Okay.  I never knew that answer.  So that wasn't
3   the case here?  So every year, I guess, every faculty member
4   is issued a letter of renewal or non-renewal?
5       A     Uh-huh (yes).
6       Q     All right.  When a letter of non-renewal is issued,
7   is there always a reason given for the non-renewal or is it a
8   standard like we have decided not to renew your form, like if
9   it was for cause, for instance, would you say in particular
10  why the person was not being renewed?
11      A     I have little experience with this.  As an at will
12  state, I don't know the best processes.  So I don't know.
13      Q     Do you know who makes that final decision?
14      A     Dr. Horton.
15      Q     Okay.  So after Dr. Barker was hired in the Fall of
16  2017, she was an English professor.  Correct?
17      A     Yes.
18      Q     Who was the English department chair or however
19  it's--is it just English or is it languages?
20      A     It's humanities, and so Dr. Kelly Lankeford was the
21  chair.
22      Q     Okay.  And does humanities encompass history and
23  English and the languages or are the languages separate?
24      A     For, I think, two years, the languages sat with the
25  humanities due to staffing issues in languages.  They have
```

52

**Copeland Court Reporters**
**(318) 387-2889**

1      Q     Yes.  That grievance.

2      A     Yes.

3      Q     And so you went to Ms. Kidd, you went to Dr. Allen,

4  and then during the investigation, you went to Dr. Barker--

5  excuse me, Dr. Horton?

6      A     Yes.

7      Q     Okay.  And you remained the--  Excuse me.  As

8  director of academic affairs, do you approve request for

9  leave?

10     A     At times during my tenure, that has been the

11 process.

12     Q     What's the process right now?

13     A     Department chairs approve faculty leave and I

14 approve department chairs, with the exception of faculty who

15 may be married to their chair, in which case, I approve their

16 leave.

17     Q     Okay.  Are there any faculty members who currently

18 are married to each other?

19     A     Yes.

20     Q     And who are those faculty members?

21     A     Dr. Allen, Ms. Lisa Benner.  Dr. Casey Green and

22 her husband, Dr. Christopher Bouton.  My husband, Randy Key,

23 is a mathematician at LSMSA.  I think that's it on the

24 faculty.

25     Q     So for instance, your husband, who would approve

58

**Copeland Court Reporters**
**(318) 387-2889**

```
1    the concern with the size of the binder as it concerned the

2    investigation, let's talk about those communications and the

3    actions that led to Dr. Barker's complaint.  We won't go over

4    all of those today because those will just be attached for

5    the court to consider, but you communicated quite frequently

6    with Dr. Barker, didn't you?

7         A    I tried to.  I'm sorry, did you say frequently?

8         Q    I said you communicated with her frequently, didn't

9    you?

10        A    Frequently?  Yes.  I heard frankly.  I apologize.

11   Yes.

12        Q    Did you communicate with her on text message?

13        A    I did.

14        Q    Did you communicate with her on email?

15        A    I did.

16        Q    Did you communicate with her on phone

17   communication?

18        A    Did we have phone calls?

19        Q    Yes.

20        A    Yes.

21        Q    Did you communicate with her on Instagram?

22        A    I did.

23        Q    Did you communicate with her on Facebook?

24        A    I did.

25        Q    Did you communicate with her on any other platform,
```

                                                                     65

**Copeland Court Reporters**
**(318) 387-2889**

```
1    activities, with other faculty members?

2         A    I have.  Yes.

3         Q    And who, what are their names?

4         A    I've had lunch outside of work with Kelly

5    Lankeford.  I have socialized outside of work with Dr. Jason

6    Anderson.  I attend church with Ms. Crystal Lewis.  I have

7    been to, you know, the--the Christmas parade or the

8    homecoming parade downtown, I might see six or eight people I

9    work with and maybe we stop and talk, maybe we spend time

10   together, maybe it's a wave and a pass, I'm not sure.  One of

11   the movies I attended with Dr. Barker, Dr. John Allen and a

12   guest of his was in attendance.  But as we know, Natchitoches

13   is small and a single movie theater.  We often find other

14   folks in there that we know.  So have I answered your

15   question?

16        Q    You did.  Was there ever a time that you had

17   invited Dr. Barker to Toledo Bend?

18        A    I did.

19        Q    Tell us about that.

20        A    Some family friends of ours have a camp at Toledo

21   Bend.  I've known the Atkins for nearly thirty years.  Their

22   daughter, Caroline, was a current student at LSMSA at the

23   time and was in Dr. Barker's English elective, I think.

24   Caroline's father, Philip, had met Dr. Barker and had met

25   Ms. Jenny Schmidt at previous LSMSA events, I believe, and
```

68

**Copeland Court Reporters**
**(318) 387-2889**

1    go see the 8:00 p.m. showing on Saturday, or whatever it was.

2        Q    Was it ever referred to as a double date?

3        A    Yes.  I made a joke and said potential double date.

4        Q    Another joke about a potential double date with a

5    faculty member at the time, Dr. Barker.  Correct?

6        A    Yes.

7        Q    Do you know when this would've occurred, in terms

8    of the time line?

9        A    I think in--early in 2018, I think, in the Winter,

10   like--like January of February of '18, I think.

11       Q    And was this the only time you went to the movies

12   with Dr. Barker?

13       A    I believe she joined my daughter and I for A

14   Wrinkle In Time.  Andrew Neeman--

15       Q    I'm sorry to cut you--  What's A Wrinkle In Time?

16       A    A film.

17       Q    The film?

18       A    Uh-huh (yes).  The film.  Andrew Neeman was also

19   there from the school.  It was just happenstance.

20       Q    You testified you had a daughter.  How many

21   children do you have?

22       A    I have two daughters.

23       Q    Okay.  I'm assuming they lived with you in

24   Natchitoches during this time as well?

25       A    Uh-huh (yes).  Yes.

73

1      Q     And your husband also lives with you?

2      A     Yes.

3      Q     Does any other individual live with you?

4      A     My mother.

5      Q     Okay.  Has she lived with you during this entire

6  time period?

7      A     Yes.

8      Q     Okay.  So obviously, it seems like, from my

9  perspective, that you and Dr. Barker were friends and

10 friendly.  When did, from your perspective, this change?

11     A     In May of 2018, Dr. Kelly Lankeford asked for a

12 meeting, and in that meeting, she shared with me that she was

13 concerned about how Dr. Barker was representing our

14 friendship to other faculty members, and her concerns seemed

15 to be centered on Dr. Barker's claims of access to

16 administration, access to administrative conversations and

17 administrative concerns, and Dr. Lankeford expressed in that

18 meeting that she was not comfortable with how Dr. Barker was

19 representing things.  To your question, for me, this was the

20 beginning of my personal concerns about Dr. Barker and

21 whether our friendship could be maintained.

22     Q     When you say she, Dr. Barker, had access to

23 administrative--or that was the allegation, that she had

24 access to administrative decisions or thought processes or

25 things like that, let's walk through that.  During your

74

**Copeland Court Reporters**
**(318) 387-2889**