```
                    UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF LOUISIANA
                          ALEXANDRIA DIVISION
                              * * * * *

JUSTIN BARKER                        )
                                     )
VS.                                  )    No. 1:21-CV-04419
                                     )
LOUISIANA SCHOOL FOR MATH            )
SCIENCES & THE ARTS.                 )
                              * * * * *

                            DEPOSITION OF

                          DR. STEVE HORTON

taken commencing at 8:59 a.m. on the 15th day of December,
2022, at Hudson, Potts & Bernstein, 1800 Hudson Lane, Suite
300, Monroe, Louisiana 71201, on behalf of the Plaintiff.




                         REPORTED BY:

                         CAROLYN F. WHITE
                         CERTIFIED COURT REPORTER
                         CERTIFICATE NO. 91111
                         PARISH OF OUACHITA
                         STATE OF LOUISIANA


                     CAROLYN F. WHITE
                  CERTIFIED COURT REPORTER
             P.O. BOX 2955   WEST MONROE, LA 71294
                        (318) 396-7089
```



27

1  on a regular basis throughout the entire process either for
2  assistance in direction or to validate that what I was doing
3  would align -- was aligning with the laws that were in
4  place, so I would say that all of us were involved in a
5  process.  Our training is continuous just by the nature of
6  our relationship with our attorneys.
7  Q    Okay.  Do your attorneys hold any specific credentials
8  to teach Title IX training or are there specific -- let me
9  rephrase.  Does ATIXA or any of the Title IX offices provide
10 a certification or anything that certifies your attorneys to
11 teach?
12 A    I do not know that answer.
13 Q    Okay.  How often do you have the in-service training?
14 A    Every fall we'll have a Title IX training for the
15 faculty.  It's usually the first or second morning of in-
16 service.  We also have sexual harassment in the workforce
17 and sexual harassment in the supervisory role that all of
18 our employees have to do online through Louisiana Employees
19 Online, so those are all annual, mandatory trainings and if
20 during the year something comes through Title IX that causes
21 the policy to be adjusted or there's new information
22 regarding the interpretation of the policy, Mr. Sills or
23 Ms. Losch will come in from Hammonds and Sills and update
24 the directors and also anyone who would be involved, whether
25 it was a decision maker, which would be me, or an

47

ed around 2015, but it was specific for those institutions that received federal funding. Louisiana School does not receive federal funding, but Hammonds and Sills suggested it would be in our interest to follow Title IX regulations because we do receive federal funding via the MFP. Not directly, but indirectly through so it was decided through the school board that Title IX would be followed. Like our sister school - I'm using an example - NOCA, the New Orleans School for Creative Performing Arts, they do not follow Title IX and our fundings are identical. They have a different attorney than we do.

Q   Okay. At Louisiana School since you've been there, which I believe was July 2016, approximately how many Title IX complaints have been made? You know what, let me back up just a little bit. I learned this lesson yesterday. I want to make sure we're all using the same language. Can you tell me based on your process, is there a difference between a complaint, an allegation, a grievance based on your handbook and your process? I want to make sure that I'm using your words.

A   There is a difference between a grievance -- just a general grievance, an employee grievance, and a Title IX complaint grievance. Title IX -- and I'm ball-parking ten to 15.

Q   Ten to 15 -- I'm sorry, say it again?

92

in Dr. Barker's investigation file?

A    All of records from the interviews, from the witnesses for hers.  I cannot remember exactly which ones.  Dr. Key's and Dr. Barker's were handled simultaneously.  They were not merged.  They were simultaneously done because a lot of the allegations were similar.  The witnesses were similar, so in the investigation process rather than call someone to be a witness for A, then turn around and be a witness for B, that person was interviewed on both parts to get that person's accounting of what actually had happened.

Q    Okay.  And so you reviewed that?

A    Yes.

Q    What do you recall reviewing as far as evidence?

A    There was a binder -- a large binder that was submitted by Dr. Barker, the actual reports from both of them and I think that was comprehensively -- except for the actual investigation documents, that was the complete file and the actual complaints.  And I had to look at them separately because each of them had their own recommenda -- each of them had their own findings, each of them had their own recommendations, so I looked at each one of them separately and just made decisions on both of them separately.

Q    Okay.

A    I actually received one investigation and I cannot remember which one first and then I received the second one.

98

1  said in your office. So, you didn't have any context with
2  evidence. Did you ask follow-up questions or did you just
3  go with what Dr. Barker said in your office?
4  A    I looked at the file in its comprehensive form and I
5  was satisfied with the reports that I received from
6  Ms. Prudhomme. I was satisfied with the witness reports and
7  a recommendation that there was nothing substantial to
8  Dr. Barker's grievance.
9  Q    You stated that you didn't have any context for the
10 documents.
11 A    Correct.
12        MS. WHITE: And now, I think maybe I just need to
13 go on the record. We keep referencing my binder.
14        MS. MAI: I'm sorry.
15        MS. WHITE: These are discovery responses and are
16 not representative of the evidence that was submitted. Just
17 feel like I need to throw that out there for the record.
18        MS. MAI: Thank you.
19 Q    And yesterday Dr. Key stated a binder about that size
20 is what accompanied Dr. Barker's grievance –
21 A    Right.
22 Q    -- formal grievance which is why I keep pointing to
23 that because Dr. Key used it as a reference. Did you ask
24 any clarifying questions to get context about the binder?
25 A    No.

CAROLYN F. WHITE
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA 71294
(318) 396-7089

141

1  Q    To your knowledge, did Dr. Barker ever have any
2  negative faculty evaluations?
3  A    Not that I know of.
4  Q    To your knowledge, did Dr. Barker ever have any
5  negative evaluations at all?
6  A    Not that I know of.
7  Q    You issued a letter of non-renewal to Dr. Barker in the
8  spring of 2020.  Do you remember the terms of that non-
9  renewal or what your letter stated?
10 A    I have you a copy of it.  It was -- basically I did not
11 renew her -- based on the results of the grievance that was
12 filed, my justification was that she had communicated issues
13 regarding this grievance publicly and that was a violation
14 of the grievance policy and she was creating an
15 uncomfortable or hostile work environment for Dr. Key.  For
16 those two reasons I opted not to renew her contract for the
17 next year.  I supported the recommendation of the
18 investigator and I did not renew her contract for the next
19 year.  I did not offer her a contract for the next year.
20 Q    Okay.  You mentioned -- I want to make sure I have your
21 -- did you say a violation of confidentiality --
22 A    Yes.
23 Q    -- policy?  I want to double check.  I believe earlier
24 you testified that the confidentiality part -- that policy
25 changed --

```
                                                                    144
 1   about the uncomfortableness of it ever having gotten out and
 2   how it eroded some of the morale in the school.  But most of
 3   these came -- I'm not saying most.  They all came to me in
 4   that process during that process that it had been discussed.
 5   It was -- one of them said basically anybody that would come
 6   down the hall, they -- it would become a conversation and
 7   again if I was -- if no one knew about it, how was everyone
 8   aware of it?
 9   Q    Dr. Horton, were any grievances formal or informal,
10   general or Title IX, ever filed against Dr. Key?
11            MS. WHITE:  Other than the one that we're here on?
12   A    Other than --
13   Q    Other than this one?
14   A    No.
15   Q    No?  Okay.  Did the violation of confidentiality -- was
16   that reason listed in the investigative findings on
17   Dr. Barker's Title IX investigation --
18   A    No.  That was not --
19   Q    -- or grievance investigation?
20   A    That was in mine.  Was given as a reason in my
21   notification terms of why I was ending her employment.
22   Q    It was in your letter?
23   A    Yes.
24   Q    Did you type that letter?
25   A    Yes.
```

**CAROLYN F. WHITE**
CERTIFIED COURT REPORTER
P.O. BOX 2955   WEST MONROE, LA  71294
(318) 396-7089